1      IN THE UNITED STATES DISTRICT COURT
     IN AND FOR THE EASTERN DISTRICT OF WASHINGTON
2
─────────────────────────────
3                             )
UNITED STATES OF AMERICA,     )
4                             )
                 Plaintiff,   )   NO. 1:19-CR-6017-SAB-1
5                             )
         -vs-                 )
6                             )
JEREMY JAY GULLETT,           )
7                             )   October 4, 2019
                 Defendant.   )   Yakima, Washington
8 ─────────────────────────────

9

10              VERBATIM REPORT OF PROCEEDINGS
                   EVIDENTIARY HEARING
11
          BEFORE THE HONORABLE STANLEY A. BASTIAN
12              UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  FOR THE PLAINTIFF:        BENJAMIN D. SEAL
                             Assistant U.S. Attorney
15                           402 E Yakima Ave., Ste. 210
                             Yakima, WA  98901
16
   FOR THE DEFENDANT:        PAUL E. SHELTON
17                           Federal Defenders of Eastern
                             Washington
18                           And Idaho
                             306 E. Chestnut Ave.
19                           Yakima, WA 98901

20

21
   REPORTED BY:              Lynette Walters, RPR, CRR, CCR
22                           Official Court Reporter
                             P. O. Box 845
23                           Yakima, WA  98907
                             (509) 573-6613
24
   Proceedings reported by mechanical stenography; transcript
25  produced by computer-aided transcription.

1                          I N D E X

2                                                    Page

3              Defendant's Motion to Seal            4

4              Defendant's Motion to Suppress        5

5

6

7                  INDEX TO WITNESSES

8                                                    Page

9     GOVERNMENT'S WITNESSES

10    KEITH SCHWARTZ
         Direct Examination by Mr. Seal             36
11       Cross-Examination by Mr. Shelton           45
         Redirect Examination by Mr. Seal           63
12
      ELIZABETH GRANT
13       Direct Examination by Mr. Seal             64
         Cross-Examination by Mr. Shelton           70
14

15    DEFENDANT'S WITNESSES

16    ISAAC MERKL
         Direct Examination by Mr. Shelton          81
17

18

19

20

21

22

23

24

25

1     (OCTOBER 4, 2019, 1:30 p.m.)

2     THE COURT:  Good afternoon.  Please be seated.

3     THE CLERK:  The matter now before the court is the

4  United States of America versus Jeremy Jay Gullett, Case

5  No. 4:19-CR-06017-SAB.  This is the time set for a motion

6  hearing.

7     Counsel, please state your presence for the court and

8  record.

9     MR. SEAL:  Benjamin Seal on behalf of the

10  United States.  Good afternoon, Your Honor.

11     THE COURT:  Good afternoon.

12     MR. SHELTON:  Paul Shelton, Federal Defenders office,

13  for Mr. Gullett, who's present in custody.  Good afternoon,

14  Your Honor.

15     THE COURT:  All right.  Good afternoon.

16     All right.  We're here for defendant's motion to

17  suppress.  I have reviewed everything that's been submitted so

18  far.  This is found at ECF 26.

19     And, so, counsel, this is your motion.  So,

20  Mr. Shelton, I'll let you proceed.  Do you intend to present any

21  testimony or witnesses?

22     MR. SHELTON:  Your Honor, we do have one witness that

23  we have subpoenaed, Officer Merkl, the K-9 officer.  I'll defer

24  to the court whether it wants to hear any opening statements, go

25  straight into testimony, or it may make sense to have the two

1    witnesses the government intends to put on.  I think, given the

2    exhibits we attached to our motion, we shifted the burden back

3    to the government to overcome some of these questions in the

4    motion to suppress.  So I don't know if it will make more sense

5    to hear from those two officers before Officer Merkl.

6                THE COURT:  It does.

7                MR. SHELTON:  Sure.  And just because it's a

8    relatively simple issue, I don't believe the court ruled on our

9    motion to seal the government's response.  There was some

10   information in the body of the response itself, on page 4, that,

11   unquestionably, should not be on the public docket.  Counsel for

12   the government has agreed with that.  And I actually didn't

13   realize it when I filed my motion to seal, but the government

14   failed to redact the defendant's date of birth from two of the

15   exhibits attached to that response.

16               THE COURT:  Okay.  So what is it you want to seal, to

17   save me time looking at the record?

18               MR. SHELTON:  I, frankly, would like to seal all of

19   ECF 34, including the attachments.  I think that would cover

20   both the body of the response and the two exhibits attached to

21   it.

22               THE COURT:  So ECF 34 is the government's response to

23   your motion, and the attachments?

24               MR. SHELTON:  Correct.

25               THE COURT:  And can you tell me why you want to seal

1  it, or do you want to seal the courtroom?

2       MR. SHELTON:  If you look at Page 4, there's a

3  footnote that references some statements that Mr. Gullett

4  allegedly made to one of the officers.  A, those statements have

5  not been disclosed before their disclosure in the response.

6  But, B, the subject and context of those statements, if the

7  court reviews them, pretty clearly should not be in a public

8  court document.  That's the kind of thing this court typically

9  will seal when parties file them.

10      THE COURT:  All right.  I haven't really studied that.

11 Is any of this going to come up in the testimony?

12      MR. SHELTON:  I don't believe so.  I don't have any

13 questions on that particular issue.

14      THE COURT:  Mr. Seal?

15      MR. SEAL:  Not from the government.

16      THE COURT:  All right.  I'll take your motion to seal

17 under advisement, and I'll look at it.

18      But let's get started with the testimony.  So,

19 Mr. Seal, sounds like you have a few witnesses to present.

20      MR. SEAL:  I do.  But I would like to have a

21 conversation with the court about what I think are preliminary

22 legal questions.

23      THE COURT:  Okay.

24      MR. SEAL:  I want to start by laying out just a small

25 number of facts that I think are not in dispute.

1        First, there was a valid arrest warrant for the

2 defendant.  My understanding is they're not disputing that.

3        Second, the detectives observed the defendant, and

4 they recognized him.  That is not in dispute.

5        Third, they arrested him pursuant to the warrant.

6 Fourth, they called for a K-9, and the K-9 alerted to the

7 vehicle.  I don't think any of that is in dispute.

8        And, then, fifth --

9        THE COURT:  Do four again.  I was still writing down

10 three.

11        MR. SEAL:  Sorry.

12        THE COURT:  That's all right.

13        MR. SEAL:  They called the drug K-9, and the K-9

14 alerted.

15        THE COURT:  Okay.

16        MR. SEAL:  And based on what had happened up to that

17 point, they obtained the search warrant, and then they searched

18 his car.

19        THE COURT:  So six things.

20        MR. SEAL:  And it's my understanding that the parties

21 both agree to those facts there.

22        And the government's argument is that I don't think we

23 need to have any testimony.  The defense motion is that the

24 government lacked reasonable suspicion to prolong the stop in

25 order to call for the K-9.  However, I think the key question

the defense counsel needs to answer is, if the police already

had the defendant in custody pursuant to a valid warrant, why on

earth would they need any reasonable suspicion?

I think my argument is that's a threshold legal

matter. If the answer is they didn't need reasonable suspicion

because they already had the defendant in custody on a legal

warrant, I don't know why we need this hearing today.

THE COURT: Who are the witnesses you have?

MR. SEAL: Two witnesses, Your Honor, Detective Keith

Schwartz, and Elizabeth Grant. And they are the two detectives

involved in observing the defendant and executing the warrant

that day.

THE COURT: What agency are they with?

MR. SEAL: They're with the Kennewick Police

Department.

THE COURT: Let's find out from Mr. Shelton before I

indicate what I'm thinking. Mr. Shelton, Mr. Seal indicates, in

his opinion, there's no real disagreement over those six facts

which I wrote down. I can repeat them for you, but I assume you

did too.

MR. SHELTON: I did. No, we don't dispute those six

facts.

THE COURT: All right. And you have a witness.

What's his name, again? I remember the motion, but I don't

remember names.

1        MR. SHELTON: Isaac Merkl, M E R K L. He's a K-9

2  officer, also with the Kennewick Police Department.

3        THE COURT: What's he here to testify about?

4        MR. SHELTON: He would be here to testify about a

5  couple of things. One, kind of generally when he is called out

6  for K-9 sniffs.

7        THE COURT: Is he the K-9 officer?

8        MR. SHELTON: He is the K-9 officer in this case.

9        THE COURT: Okay.

10       MR. SHELTON: To some degree he'd testify about K-9

11  sniffs generally. And then more specifically, what I would want

12  to ask Officer Merkl about would be his specific interactions

13  with Mr. Gullett on February 22nd. There's some, at least in my

14  view, gray areas and discrepancies amongst the three officers'

15  reports in terms of when they had conversations with

16  Mr. Gullett, and what he said to each officer. So I think it

17  would provide clarity to the entire interactions with him to

18  have Officer Merkl speak to that.

19       THE COURT: Mr. Seal has indicated, for purposes of

20  proving his case, he doesn't think he needs to have the

21  testimony, he's willing to hear your argument and respond.

22       At least that's what I'm hearing you say, Mr. Seal.

23  Are those facts that -- those six facts, are they fleshed out

24  enough for the record? I generally know what you're saying, but

25  have you fleshed them out enough?

1       You know, I always have to assume that there might be

2 an appeal of what I do. And, so, we want to make sure that the

3 judges, if there is an appeal, have sufficient facts to rule on

4 the appeal. So that's why I ask these questions.

5       MR. SEAL: I appreciate the court being careful.

6 That's the best way to do it.

7       THE COURT: Okay.

8       MR. SEAL: I think they are. The facts, as I've

9 stated them, the government's argument is if those are taken to

10 be correct, then I think the court can make a decision just

11 applying the law to those particular facts.

12       THE COURT: All right. Thank you.

13       Mr. Shelton, do you need Officer -- or Detective

14 Merkl's testimony for your motion, or is it really more kind of

15 rebuttal based on where the prosecutor goes?

16       MR. SHELTON: I think we do need it for the motion.

17       And I think the broader issue is, essentially what the

18 government is arguing and what its position is is that they had

19 a valid warrant to arrest Mr. Gullett, which is not disputed;

20 therefore, they could search the car. And Mr. Seal and his

21 predecessor in this case are simply wrong about that fact.

22       THE COURT: I don't think that's what they're arguing.

23       MR. SHELTON: I think it is, based on his response and

24 what his statements here today. He's saying simply because we

25 had a valid arrest warrant, we do not have to go through

1  reasonable suspicion analysis with regard to searching the car.

2  And that simply not true.  *Arizona v. Gant* makes clear that --

3          THE COURT:  No, but don't they have the right to seize

4  the car, since it was in his possession, and then do an

5  inventory search?  Isn't that proper police procedures?

6          MR. SHELTON:  I don't believe they have that right.

7  And for the record, the government has not argued that.  It has

8  not made that argument.

9          THE COURT:  Okay.

10          MR. SHELTON:  But I don't believe they would have had

11  that right.  That car was parked, by all accounts, lawfully in a

12  private parking lot.  There was somebody else there who could

13  take possession.  Mr. Gullett was not the registered owner.

14          THE COURT:  Okay.  I don't need the whole argument

15  now.

16          MR. SHELTON:  Sure.

17          THE COURT:  I'm just saying maybe there's reasons why

18  maybe they didn't have to seize the car.

19          All right.  I'm going to make this suggestion and see

20  how you respond.  Why don't we just go into the argument, and

21  I'll ask my questions, and then if either side wants to present

22  some testimony to flesh out some issues that maybe weren't

23  anticipated, we could do that.  Would that work, or do you want

24  to present Officer Merkl's testimony?  Which, that's fine.

25          MR. SHELTON:  Here's the concern I have, Your Honor.

1          THE COURT:  Okay.

2          MR. SHELTON:  And this is not with regard to Officer

3   Merkl, it's with regard to the other two officers.

4          THE COURT:  Okay.

5          MR. SHELTON:  So, again, our argument is, irrespective

6   of the arrest warrant, they must have had some suspicion to

7   search the car for drugs.  Without that, it's an illegal search.

8   Their basis for that, at least according to the reports and the

9   search warrant declaration, were these purportedly anonymous

10  tips that they had received at some ambiguous point prior to

11  February 22nd.

12         Based on several conversations with the government

13  since filing our motion, and even before, it's clear that, A,

14  those tips were not, in fact, anonymous.  But, B, we still don't

15  know who gave them, when, or what exactly they said, so we're

16  essentially trying to attack blindly here.  We don't know how to

17  attack them.  We've made an anonymous tip argument in our motion

18  that I think would still apply, given we don't know about the

19  tipsters.

20         But according to information from the government these

21  weren't anonymous tips.  These were people who were arrested by

22  the CAT Team that gave information either directly to these

23  officers or to other officers.  So the analysis may entirely

24  change.  So I don't know that we can really argue this motion

25  blind.  I'm happy to do so and then take up the facts if the

1    court thinks it's appropriate, but I think we're operating at a

2    disadvantage without getting a clear record, given some pretty

3    apparent discrepancies that have been set out in the motion and

4    that we've learned about since filing it.

5              THE COURT:  So what are you asking me to do?  It's

6    your motion.

7              MR. SHELTON:  I would like to have the officers

8    testify.  If the court wishes to do argument first, and then say

9    I think I need testimony as to these specific issues, I'm happy

10   to do that.

11             Given our complete difference in terms of the legal

12   argument that the government says reasonable suspicion analysis

13   doesn't apply at all, and we say it does, that may be an initial

14   argument we can have for this court to make that decision.

15   Because if you side with the government, then, no, we don't need

16   testimony.

17             THE COURT:  Who has the burden of proof?  It's your

18   motion.  But, of course, the government wants to introduce this

19   evidence at the time of trial.  To survive the motion to

20   suppress, who has the burden of proof?

21             MR. SHELTON:  I think the case law makes clear we have

22   an initial burden to raise an issue, and to make evidence of

23   some potential problem with the search.  But once that is

24   raised, and I believe it has been in the exhibits we filed to

25   our motion, the burden is ultimately on the government to prove

1   the search was not unlawful.  So I think, at the end of the day,

2   the government bears the burden.

3           THE COURT:  Mr. Seal.

4           MR. SEAL:  So, I think it's helpful if we focus on

5   exactly what is the issue that we wanted to hear testimony on.

6           And let me back up a little bit to say the car was

7   searched pursuant to a warrant.  So the police in this case,

8   they did not search the car at all until they got a warrant.

9   But from what I hear from Mr. Shelton, and reading his brief, he

10  is not challenging the four corners of the warrant.  He's simply

11  saying that the police didn't have reasonable suspicion to

12  detain the car while they waited for the dog to arrive.

13          Okay.  That's a valid argument to make if this were,

14  for example, a traffic stop, and at the end of the traffic stop,

15  unless the police have built up some new reasonable suspicion,

16  when the traffic stop is completed, they have to let the

17  defendant go.  They can't force somebody to wait for a dog to

18  show up if it's a regular traffic stop.

19          THE COURT:  They can for a reasonable period of time,

20  can't they?  Isn't it always an issue of reasonableness?  Even

21  if it's a traffic stop, if the dog is, you know, right there --

22  doesn't matter.  We don't have a traffic stop.  That's for

23  another day.

24          MR. SEAL:  Because the defendant was already in

25  custody, waiting for a dog to show up did not subject the

1    defendant to any additional detention.  So I don't think the --

2    as a purely legal matter, I don't think the reasonable suspicion

3    argument that he's making applies.

4         THE COURT:  Okay.  So the prosecutor believes, with

5    these stipulated facts, they have enough to proceed.

6         MR. SHELTON:  I think we can at least have the

7    argument with respect to did they need independent reasonable

8    suspicion.  Again, I think it's clear that the government's

9    position is none of that analysis applies.

10        Now, the government is somewhat conflating the two

11   arguments presented in the motion.  But the fact of the matter

12   is government is saying he had a valid arrest warrant;

13   therefore, they needed no other excuse to search the car.

14        MR. SEAL:  That is not our argument.

15        MR. SHELTON:  I would like the government to explain

16   what the argument is, then, because that's how I read the

17   response.

18        THE COURT:  We're trying to figure out the process.

19   Mr. Seal has said that, based on your stipulation to these six

20   facts which he's fleshed out on the record, and I've written

21   down, that he has presented the facts sufficient for him to

22   argue what he wants to argue.

23        MR. SHELTON:  My argument would be before fact four,

24   which is when the K-9 was called out, that they had no basis to

25   do so, because --

1          THE COURT:  That's your argument?

2          MR. SHELTON:  That is the argument.  Correct.

3          THE COURT:  All right.  We'll get to that in just a

4     minute.  But do you stipulate to the six facts as represented by

5     Mr. Seal.

6          MR. SHELTON:  Those particular six facts, yes.

7          THE COURT:  Does the government rest for purposes of

8     this motion, subject to the ability to present rebuttal

9     evidence, if necessary?

10          MR. SEAL:  Yes, I think so.  Let me just make sure I'm

11     on exactly the same page with the court as far as the six facts.

12     There was a valid arrest warrant.

13          THE COURT:  Let me --

14          MR. SEAL:  Yes, if you could read them back.

15          THE COURT:  Yeah.  And the facts are on the record

16     that Lynette has made for us.  I'm going to read my notes.

17          Number 1, there was a valid arrest warrant for

18     the defendant.  Number 2, the detectives involved observed

19     the defendant and recognized him.  Number 3, the detectives

20     arrested the defendant based on the outstanding arrest warrant.

21     Number 4, after he was arrested, the detectives called the K-9

22     unit, and upon arrival, the K-9 dog alerted.  Number 5, based on

23     that, the detectives searched -- excuse me.  Based on that, the

24     detectives requested a search warrant of the car.  And Number 6,

25     the car was then searched based on the search warrant.

1          MR. SEAL:  That's correct, Your Honor.

2          MR. SHELTON:  The only clarification I would offer,

3     and it is in the record, is that the search warrant was for

4     failing to appear.  It was not for any new criminal conduct --

5          THE COURT:  The arrest warrant.

6          MR. SHELTON:  Correct.  The arrest warrant.  Sorry.

7     The arrest warrant that was issued --

8          THE COURT:  Was a failure to appear.

9          MR. SHELTON:  -- was a failure to appear.

10          THE COURT:  And, Mr. Seal, does the government accept

11     that alteration?

12          MR. SEAL:  Yes.

13          THE COURT:  All right.  Then based on that stipulation

14     of those six facts, does the government rest in terms of its

15     presentation of evidence for purposes of this motion, subject to

16     the opportunity for rebuttal?

17          MR. SEAL:  I guess.

18          THE COURT:  I'm not trying to put you in a bad spot.

19     I just want to know.  We've got the witnesses here, and with

20     some reluctance, I'll let you proceed.

21          MR. SEAL:  I'm happy to put witnesses on.  I think,

22     with those stipulations, I think the court can make a decision

23     today.  I don't think you need to hear evidence, because, based

24     on these facts, there's not a reason to suppress the fruits of

25     that search warrant.

1          THE COURT:  Well, I'm not going to go that far and say

2    you win.

3          MR. SEAL:  Okay.

4          THE COURT:  I am going to go as far as you suggested,

5    that these facts seem sufficient to me for purposes of the

6    argument that I think you want to make.  I'm not saying you're

7    not going to win.  I haven't decided.

8          MR. SEAL:  Yes, that is my argument, that we have

9    enough with that.

10         THE COURT:  Okay.  So, Mr. Shelton, then, the

11   government has submitted their evidence that they want me to

12   consider so that they can make the argument that your motion to

13   suppress should be denied.

14         You have three witnesses here.  If you want to present

15   any evidence, this is your opportunity.

16         MR. SHELTON:  It's an odd posture, Your Honor, because

17   frankly, again, my preference would be to call all three, but we

18   only subpoenaed one, because the other two are, quote, unquote,

19   government's witnesses.

20         THE COURT:  They're all here.  You can call whoever

21   you want.

22         MR. SHELTON:  Here's what I think would be most

23   helpful to the court, because I think it will be a minimal waste

24   of time.  I think we should argue the question that the

25   government has presented, that on those six facts alone, without

1   any further facts, could this court find that the search was

2   lawful, and, therefore all the evidence can come in.

3        Because I think *Arizona v. Gant* makes clear that is

4   not the case.  If the court disagrees with us, then the court

5   denies the motion to dismiss, and we're done.  If the -- the

6   motion to suppress.

7        If the court agrees with us, then I think at that

8   point the government would probably be in a position to call its

9   witnesses first.  So I think that would be the most judiciously

10   efficient way to proceed.

11        THE COURT:  Okay.

12        All right.  Mr. Seal, I'll put the question to you

13   this way.  Usually, as you know, I take these under advisement.

14   Counsel is arguing that *US v. Gant* dictates that I rule in his

15   favor.  Assuming that's true, and I do that -- not saying I'm

16   going to -- do you want more facts in the record for purposes of

17   your argument?

18        MR. SEAL:  Uhm, I think in response to that, I agree

19   with Mr. Shelton and what he laid out.  If the court would be

20   inclined to -- I think the court can look at the facts we've

21   stipulated to and say, yup, the government wins, we're done.  If

22   the court isn't comfortable doing that, it doesn't want to do

23   that, then I'll put on my witnesses, and we'll go through the

24   whole process, and then the court can take the whole thing under

25   advisement.

1          THE COURT:  Let's hear the argument.  Because I think
2     these are sufficient facts for purposes of the government to
3     win.  I'm not saying the government is going to win, but I don't
4     know why they wouldn't.  But that's why you brought this motion.
5          MR. SHELTON:  That is.  And that's why I think the
6     short answer to why are those facts not sufficient is *Arizona v.*
7     *Gant*.  And just brief recap, let's talk about how very similar
8     those two cases are.
9          THE COURT:  All right.  Let's go the argument phase --
10         MR. SHELTON:  Sure.
11         THE COURT:  -- and I'll give you a chance, if you want
12    to supplement the record with some focused testimony, you can do
13    that.
14         MR. SHELTON:  Certainly.
15         So, again, to be clear, as I read the government's
16    response -- and I appreciate if Mr. Seal disagrees with this
17    he'll have the opportunity to correct how he reads it.
18         THE COURT:  He will.
19         MR. SHELTON:  The government's response is that the
20    officers had a valid arrest warrant, and they arrested
21    Mr. Gullett pursuant to that warrant without any additional
22    suspicion of any ongoing criminal activity or suspicious furtive
23    movements, or anything like that, it was strictly based on the
24    warrant -- I think if you look at their responses at Pages 5
25    and 6, it's clear that's what they're saying -- therefore, they

had grounds to search the car, and this *Terry* analysis does not apply.

In *Arizona v. Gant*, the Supreme Court said that a warrantless search of a vehicle is not authorized once an arrestee is secured outside of the vehicle, cannot access the interior, and if there is no reason to believe evidence of the offense of arrest might be found therein.

The defendant, in *Gant*, had a suspended driver's license and an outstanding arrest warrant.  The police literally observed him driving, which would be a crime of driving without a license, drove up to his residence and parked.  They immediately took him into custody pursuant to both his arrest warrant and the new offense of driving without a license.  They secured him in handcuffs, they placed him in the police car, and only then did they search his car, without consent or any other cause or warrant, and found a gun and cocaine.

The Supreme Court held that search was unlawful.  They specifically held that a vehicle cannot be searched simply because a recent occupant has been arrested.  They held that the search of the vehicle is only justified when a suspect is not secured, and is within reaching distance of the passenger compartment, the justification being for officer safety.  They might be able to get to a weapon if they're unsecured.  Both the defendant in *Gant* and Mr. Gullett were handcuffed and in a police vehicle.  So that exception does not apply.

1        THE COURT:  But in this case a warrant was obtained,

2  so it is a little bit different than *Gant*.  And how does that

3  impact your analysis?

4        MR. SHELTON:  I don't believe it is, because -- I'll

5  get to that part in a second.  But I want to make clear why *Gant*

6  covers all the facts pre them getting the warrant.  The search

7  of the car was not legitimate because they had no reason to

8  believe any evidence of the crime of arrest, in that case the

9  outstanding warrant and driving without a license, would be in

10  the car.

11        Same facts here.  There was no reason for the police

12  to believe evidence relating to the arrest warrant for the

13  failure to appear would be in that car.  So unless they had some

14  independent reason and suspicion to suspect other ongoing

15  criminal activity, like drug dealing, they had no reason to

16  search that car.

17        THE COURT:  Except they had a warrant.

18        MR. SHELTON:  No, they did not, that night.  They

19  called the K-9, got the K-9 to sniff the car and alert.  They

20  then took Mr. Gullett into custody, to the jail, seized the car,

21  then applied for an application for a search warrant, and got

22  the warrant.  None of that should have happened, because they

23  had no basis to search the car.  They had no basis to call for a

24  K-9 to sniff that car.

25        Mr. Seal is right.  I'm not challenging the four

corners of the warrant, because I'm not challenging factually

what's in the warrant.  I'm not saying what's in the warrant is

untrue.  Although, I think there are some question marks, given

what we've learned from the reports.  But I'm not challenging

the four corners of the warrant and saying if everything in that

warrant is true, it does not give probable cause.

I am saying as soon as they had Mr. Gullett seized, in

handcuffs in that car pursuant to that warrant, that was it.

They had no basis whatsoever under the law to take any

additional steps, and yet they did, and those steps are what is

unlawful.  And but for those unlawful steps, they never would

have gotten that warrant that they got to search the car.

THE COURT:  What step did they take that was unlawful?

MR. SHELTON:  Calling the K-9.

THE COURT:  Why?  They can call the K-9 anytime they

want, can't they?

MR. SHELTON:  I do not believe, under these

circumstances, they can call the K-9.

THE COURT:  Why?  Tell me why they can't call the K-9.

MR. SHELTON:  Since there's no basis to arrest

Mr. Gullett, detain him, anything like that, other than the

warrant.  If you take that factor, the fact that he had a

warrant, out of the equation, then calling the K-9 --

THE COURT:  Could they call the K-9 just to have the

K-9 wander through the parking lot just to see if it alerts to

1  something, could they then use that to establish probable cause

2  to search a car, say?

3        MR. SHELTON:  I don't believe they can, no.

4        THE COURT:  Why?

5        MR. SHELTON:  Because that was a private parking lot.

6  Because they had no reason -- again, removing Gullett's warrant,

7  they couldn't have had the K-9 sniff a car three cars down

8  without some basis to do so.

9        THE COURT:  Who owned this parking lot?

10        MR. SHELTON:  The motel.

11        THE COURT:  Is the parking lot open to the public?

12        MR. SHELTON:  No, it is not open to the public.

13        THE COURT:  Why not?

14        MR. SHELTON:  Because it's open to registered guests.

15  There are signs saying if you are not allowed to be here, you

16  will be towed.

17        THE COURT:  So you're saying they can't just call the

18  K-9 and just walk through the parking lot?

19        MR. SHELTON:  That is my contention.

20        THE COURT:  What case do you have that says that?

21        MR. SHELTON:  Because the government did not raise the

22  issues in the briefs, we haven't cited that.

23        THE COURT:  But I'm not limited to just what the

24  government raised.  And one of the issues I was kind of

25  anticipating was a searched based on a legitimate impound.  I

1   don't know if that's what's being argued, but that's what

2   occurred to me as I was looking through the paperwork.

3       MR. SHELTON:  To the extent the court thinks that may

4   save the government because nothing else would, I'd ask the

5   opportunity to address it.

6       THE COURT:  I didn't say that.

7       MR. SHELTON:  I understand.  I'm not saying that's

8   what the court is saying.  I'm saying if the court wants us to

9   address that issue, could they have brought the K-9 and searched

10   this parking lot without any other basis for doing so, I think

11   we would need to address that, because, frankly, I don't know

12   the answer.  I'm not aware if there's a case that addresses

13   those particular facts.  K-9s are usually called with some

14   suspicion.  They're not just called out --

15       THE COURT:  Usual and customary is not the issue here.

16   It's whether they had the right to call the K-9 in this case

17   that this court is concerned about.

18       And your argument is that once they had him under

19   arrest based on this arrest warrant, they did not have probable

20   cause to call the K-9, and not having called the K-9, they would

21   not have had probable cause to search the car.

22       MR. SHELTON:  I wouldn't say they didn't have probable

23   cause to call the K-9, because I don't think that's the

24   standard.  I would say they had no cause whatsoever to call the

25   K-9, probable cause, reasonable suspicion.  They didn't have any

1   reason to call the K-9.

2           THE COURT:  They didn't have a legal right to call the

3   K-9?

4           MR. SHELTON:  That is my argument.

5           THE COURT:  Why not?

6           MR. SHELTON:  Because they had no basis to suspect

7   Mr. Gullett of any criminal activity, including possession of

8   drugs.

9           THE COURT:  Okay.  Let's hear from the government.

10          MR. SEAL:  Your Honor, the -- a couple of different

11  points.  On the last piece that counsel was arguing, the -- no

12  level of suspicion is required to have a K-9 walk around a

13  vehicle.  The Supreme Court has previously held that walking a

14  drug K-9 around the exterior of a vehicle is not a search.  And,

15  so, the act of passing the K-9 around the vehicle itself, that

16  does not create any Fourth Amendment violation.  It sounds

17  like --

18          THE COURT:  Legally, could they do that every -- I

19  mean, I realize it's an issue of resources, and K-9s are

20  expensive, and most police departments the size of Kennewick

21  probably have one or two.  But legally, if it wasn't a resource

22  issue, could they have a K-9 walk around a car every time they

23  arrested someone who had possession of a car?

24          MR. SEAL:  Yes.  And, in fact, they very frequently,

25  when they arrest somebody that they think probably may have some

drugs, if there's a K-9 close by, then, sure, they'll go ahead and run the dog.  And that's what they did in this case.

Now, Mr. Shelton argued about whether or not the K-9 could come onto the motel property.  It sounds like he's trying to raise some kind of property rights or trespass argument that would be proper, I guess, if it was the owner of the hotel who was making that argument.  But that -- this defendant, Mr. Gullett, does not stand in that position.  In fact, it's my understanding he wasn't even staying at that motel.

THE COURT:  You have a standing issue to address?

MR. SEAL:  Yes.

THE COURT:  Let me go to the impound argument, then. I guess I kind of anticipated you might make that argument.  Are you making that argument?

MR. SEAL:  No, because I think if we had testimony, Your Honor, I think the agents would testify that they were not planning to impound that car.

THE COURT:  Okay.  So I'll just start there.

MR. SEAL:  The government -- well, one additional argument I will make is the moment the K-9 alerted, under federal law, the police could have searched the vehicle at that moment under the automobile exception.  Now, in this case, under Washington State law -- Washington State law does not recognize an automobile exception, so that's why they followed the process they did and went ahead and got a warrant.

1          But the Ninth Circuit is also clear that, in Federal
2    Court we apply federal Fourth Amendment procedure.  And, so, the
3    government could rely on just the K-9 alert alone to justify the
4    search.  We're not -- we're relying on the warrant as well.  But
5    the government could have argued that either way.
6               THE COURT:  You have the warrant, though.
7               MR. SEAL:  We do.
8               THE COURT:  And the warrant itself is not being
9    challenged.
10              MR. SEAL:  Correct.
11              THE COURT:  And if it were, you would have a good
12   faith exception to an otherwise proper warrant.
13              But what I'm hearing Mr. Shelton argument is that your
14   clients, the police officers, didn't have -- I used the term
15   probable cause.  I was corrected that they didn't have any cause
16   at all, according to Mr. Shelton, to call the K-9, they had no
17   reason to search that car, to want to search that car, based on
18   the information they had when they arrested the defendant.  So
19   how does the government respond?
20              MR. SEAL:  If the law required the officers to have
21   reasonable suspicion, then I would be more than happy to put the
22   agents on the stand, because I think they did have it.  But the
23   law does not require any level of suspicion to run a K-9 around
24   the outside of a car.
25              THE COURT:  Do you have a case that makes it clear?

1           MR. SEAL:  I believe so.

2           THE COURT:  Okay.

3           MR. SEAL:  Give me just a moment, Your Honor.

4           *Illinois v. Caballes*, Your Honor, cited in our brief,

5 543 U.S. 405.  A dog sniff on a vehicle is not a search, and the

6 Fourth Amendment does not require reasonable suspicion to

7 justify using a drug detection dog to sniff a vehicle.

8           THE COURT:  Okay.

9           MR. SEAL:  So I think the main argument counsel made

10 in their initial motion was they wanted reasonable suspicion to

11 justify the detention.  And that usually is how this comes up,

12 is that police have a reason to detain somebody for a defined

13 period of time, for example, a traffic stop, or even maybe a

14 reasonable suspicion based on drugs.  In any event, there are

15 some circumstances in which the reason, the justification the

16 police had to detain somebody expires, and at that point, if

17 they don't have the K-9 there handy, then they have to let the

18 person go.  But that line of cases doesn't apply here, because

19 the defendant had already been arrested.  The fact that they

20 called a K-9 did not result in any further period of detention

21 for the defendant.

22           The last thing I want to -- te last point I want to

23 make is regarding the *Arizona v. Gant* case.  I think *Gant* does

24 not apply here because *Gant* is a case that relates to the

25 doctrine of searching incident to arrest.  And the government,

1   in this case, is not relying on that legal theory to justify the

2   search or any of the activity that happened.  Well, I mean, they

3   searched the defendant, found some money on his person.  But

4   then they put him in the back of the squad car.  He was going to

5   jail that day based on the warrant.  And then they waited for

6   the K-9 to show up.  We cited a number of cases in our brief

7   saying that the *Terry* stop analysis about the time frame waiting

8   for the dog doesn't apply if there's a valid arrest warrant.

9           THE COURT:  You're not arguing they searched the

10  vehicle incident to the arrest of the defendant?

11          MR. SEAL:  Correct.

12          THE COURT:  All right.  And I recognize there's --

13  typically when there's a search incident to arrest, there often

14  is an argument as to the scope of the surrounding area.  And

15  some courts and the government will argue that the scope is

16  broad, and the defense, of course, wants the court to see that

17  area of the scope to be quite narrow.  And so that's usually the

18  kind of the dynamic that we have.  But that's not what we're

19  arguing.

20          MR. SEAL:  Correct.  They searched defendant's person

21  incident to arrest.  They did not search the vehicle incident to

22  arrest.

23          THE COURT:  They searched the vehicle after getting

24  the warrant, and the warrant was obtained because they had a K-9

25  unit with the appropriate training alert, and that there was

1   perhaps drugs in that car.

2           MR. SEAL:  That is correct.

3           THE COURT:  Okay.

4           MR. SHELTON:  If I can respond to one thing the

5   government said, Your Honor.

6           THE COURT:  Go ahead.

7           MR. SHELTON:  *Illinois v. Caballes* doesn't address the

8   question the court had, which is can they call the K-9 to sniff

9   this car in a parking lot.  *Illinois v. Caballes* does not

10  resolve this issue, because it was raised in the context of a

11  K-9 sniff during a traffic stop on a public highway.  That does

12  not address this court's concern of could they call the K-9 when

13  this is not a traffic stop, when Mr. Gullett was not driving,

14  and was, instead, in a private parking lot, with no other

15  apparent reasonable suspicion or suspicion of any kind of

16  criminal activity.  I don't think *Illinois v. Caballes* controls

17  that question.

18          I do not know whether a court has addressed the

19  question of K-9 sniffs outside of a traffic stop, for instance,

20  like here, at a hotel.  But I don't think that *Illinois* in any

21  way forecloses this argument that they had no cause to call the

22  K-9.

23          THE COURT:  Okay.  Thank you.  Hang on.  Well, go

24  ahead and have a seat.

25          I took this case over from one of the other judges, so

1    I'm not as familiar with this one as I am with cases that I

2    start with, so I just wanted to find out when the trial is.  And

3    it looks like trial is -- must have been continued.  I see an

4    order setting trial September 19.

5            MR. SHELTON:  My recollection is it's currently set

6    for October 28th.

7            THE CLERK:  October 28th.

8            THE COURT:  Okay.  Where does it say that?

9            THE CLERK:  I'll pull it up.

10           THE COURT:  I believe you.  I just want to see it.

11           MR. SHELTON:  I believe it should be ECF 24.

12           THE COURT:  Okay.

13           THE CLERK:  Yup.

14           MR. SHELTON:  Yes, ECF 24.

15           THE CLERK:  Mm-hmm.

16           THE COURT:  Okay.  Okay.  I was misreading it.

17   September 19th is the pretrial date.

18           I'm going to take this issue under advisement.  We

19   will not be going to trial on the 28th because I have some other

20   things scheduled that week.  I wouldn't have set it for the 28th

21   but for -- I didn't set it, another judge set it.

22           How long will the case take to try if it goes to

23   trial, Mr. Seal?

24           MR. SEAL:  I think two days, Your Honor.

25           THE COURT:  Mr. Shelton, will you have much more time

1   than that?

2       MR. SHELTON:  I think that would be an accurate

3   assessment.  Just for clarity, I mean, certainly, we're not

4   committing to anything today, but I think our anticipation would

5   be if the motion to suppress is denied, the only reason we'll be

6   going to trial will be to preserve appeal rights.  So, at worst,

7   it will probably be a stipulated fact bench trial.  But

8   hopefully the government would be willing to accommodate a

9   conditional plea, because that would be the only thing we'd be

10  going to trial for.

11      THE COURT:  Appreciate that.  Well, just for planning

12  purposes, and since you have all the witnesses here that will

13  probably testify at trial, it won't be the 28th.  We'll find

14  another date that works for everyone, if we need a trial that

15  involves witnesses.

16          I'm going to take this under advisement one way or the

17  other.  But let me make sure that I have the record that you

18  want for me to make this decision.  I believe I do.  But there's

19  been an argument that *U.S. v. Gant* should control my decision,

20  and some response to that.  And there's argument that the

21  government's case -- I'm sorry, I didn't get the name of it, but

22  I have the citation -- that the government's case controls the

23  decision, and the defense responds that it doesn't.  I can

24  figure all of that out.  But I want to make sure you have the

25  factual record that you need.

1    MR. SEAL:  The only question --

2    THE COURT:  I'm not sending a hidden message here.

3    MR. SEAL:  No.  I understand, Your Honor.

4    I think defense counsel was kind of bumping into some

5 kind of a, like a property rights type of argument or private

6 property argument with regard to, like, the legality of police

7 entry onto the motel's parking area.  And that -- if it came out

8 at all in the briefing, it was in their reply.  And, so, I

9 don't -- I guess if the court was inclined to make a decision

10 that was going to hang on that legal theory, I think more needs

11 to be fleshed out on that.

12    THE COURT:  If you want to flesh it out, you may.  I

13 can't promise you one way or the other.  I think the issue comes

14 down to do I think *Gant* pulls me one way, or do I think your

15 case pulls me the other way.  So in light of that, if you want

16 to make a record, I'll give you time.

17    MR. SEAL:  Well --

18    THE COURT:  I'm not saying you need to make a record.

19 I want to make sure you have your record.

20    MR. SHELTON:  I think the problem we could run into is

21 I think this court could find both that *Gant* requires more than

22 he had a warrant, but also that *Illinois v. Caballes* means the

23 K-9 search was lawful.

24    So I think I would join the government in saying

25 there's an issue I'd like to flesh out, and turn I can turn it

1 around as quickly as possible, for the court to address this

2 question of could they bring the K-9 out, assuming the warrant

3 was not enough.

4       Because the government's position under *Illinois v.*

5 *Caballes* is a K-9 search is not a search in any context,

6 including this one.  I would like the opportunity to respond to

7 that, because, as the government said, we haven't really fleshed

8 that out, frankly, because the arguments presented on both sides

9 didn't address that.

10       THE COURT:  So you want to present some testimony?

11       MR. SHELTON:  No.  I would ask for the opportunity to

12 show the court any cases we could find.  I don't think factual

13 testimony is going to change that decision.

14       THE COURT:  If you want to submit additional briefing,

15 that's all right.

16       MR. SHELTON:  I think, given the question the court is

17 grappling with, I don't think we need testimony at this point,

18 because I think the court has to make that legal decision first.

19       THE COURT:  I'm perfectly comfortable making the legal

20 decision.  If you want more time to brief it, I'm okay giving

21 you that.

22       We've got three witnesses here just raring to testify.

23 I want to make sure that you have the factual record that you

24 both need for me to make the decision you're asking me to make.

25 And I can't make that decision for you.  So I just want to make

sure.

MR. SHELTON:  My contention would be if this court finds that *Gant* controls, and, therefore, they need more than the warrant, and they did not have cause to bring the K-9, I think at that point the court may need factual testimony with respect to the tips that the officers had, because I assume, in that scenario, the government would say, well, as a fallback, they did have reason to call the K-9 because they had these tips, would be my anticipation.

THE COURT:  Mr. Seal, do you want to put that evidence on the record?

MR. SEAL:  I think so.

THE COURT:  It's up to you.

MR. SEAL:  I'll make it quick and focused.

THE COURT:  That's fine.

MR. SEAL:  Government calls Detective Schwartz.

THE COURT:  Detective, you're going to have a seat right here.  But before you take a seat, raise your right hand, and I'm going to have you sworn in.  And Erin is going to take care of that.

(KEITH SCHWARTZ, appearing as a witness for the government, being duly sworn, testified as follows:)

THE COURT:  Go ahead and have a seat.  There's water if you want it, kleenex if you need it.

Counsel.

1       MR. SEAL:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3    BY MR. SEAL:

4    Q    Can you state your name and tell us where you work?

5    A    Keith Schwartz.

6             And what was the second question?

7    Q    Where are you employed?

8    A    I'm employed with the City of Kennewick through the police

9    department.

10   Q    How long have you been a KPD officer?

11   A    Since July of 2002.

12   Q    Are you part of the CAT -- are you part of CAT?

13   A    Yes, the criminal apprehension team.

14   Q    And is that essentially a fugitive apprehension group?

15   A    We're a pro-ac team that basically enforces major --

16   investigates major felonies during the nighttime, and narcotics,

17   gang investigations.  And then we enforce any state law, to

18   include traffic.

19   Q    Were you working on February 22nd of this year?

20   A    Yes.

21   Q    And were you in -- who were you working with?

22   A    Detective Grant.

23   Q    And the two of you were in an unmarked car?

24   A    Yes, sir.

25   Q    Were you wearing a police uniform?

1   A    Yes, sir.

2   Q    And what happened just after midnight?

3   A    Just after midnight, we were in the Motel 6 parking lot at

4   2811 West Second Avenue in Kennewick, Washington, located in

5   Benton County.  When we were driving through the parking lot, we

6   observed a vehicle that Mr. -- the defendant, Mr. Gullett, was

7   seated in the driver's seat.  We recognized him from previous

8   law enforcement contact.

9   Q    Had you personally arrested him before?

10  A    Yes.

11  Q    When you saw him that night, did you have any difficulty

12  recognizing that that's Mr. Gullett?

13  A    No.

14  Q    And did you know that there was a valid warrant for his

15  arrest?

16  A    Yes, sir.

17  Q    What did you do then?

18  A    We exited -- I activated our emergency lights on our

19  vehicle behind Mr. Gullett's vehicle that was parked, and we

20  approached the vehicle, and I advised him he was under arrest.

21  Mr. Gullett complied and was taken into custody.

22  Q    And what did you do then?

23  A    I escorted him back to my vehicle and searched him incident

24  to arrest.

25  Q    What did you find?

1    A    Large quantity -- or large amount of U.S. currency.

2    Q    Was there anybody else in the vehicle?

3    A    There was a female that was in front of the vehicle that I

4    noticed.  I didn't see her in the vehicle, but I was told later

5    that she had been in the passenger seat.

6    Q    Okay.  Did you recognize her?

7    A    Yes.

8    Q    After you took Mr. Gullett into custody, did you confirm

9    the warrant?

10   A    Yes.

11   Q    Did you Mirandize the defendant?

12   A    Yes, sir.

13   Q    Did you use your department-issued card?

14   A    Correct.

15   Q    So, yes?

16   A    Yes, I did.

17   Q    And how did he respond?

18   A    He acknowledged that he understood his rights, and advised

19   that he was willing to speak with me.

20   Q    And what did he -- what did you ask him about, and how did

21   he respond?

22   A    I addressed whether or not he'd been selling narcotics or

23   drugs, as we'd been hearing on the street, and he advised that

24   he had not.  Or not exactly.  I can't remember his exact words,

25   if I can refer to my report.

1  Q    Do you have a copy of your report there with you?

2  A    Yes, sir.

3  Q    Okay.  So you can look at your report to refresh your

4  recollection.  When you're done reviewing your report, just go

5  ahead and look up and answer the question, but don't just read

6  off your report.

7  A    (Pause)

8         He stated that, just like he's told me in the past,

9  he's not a dealer, he's more of a middleman, he'll help someone

10 that needs some, and then he denied that he was a dealer.

11 Q    Okay.  What did he mean he said just as I've told you in

12 the past?

13        MR. SHELTON:  Objection.  I don't know if he can

14 testify as to what the defendant meant, his state of mind.

15        THE COURT:  Go ahead and rephrase.

16 Q    (By Mr. Seal)  What did you mean when you said, just as

17 I've told you in the past?

18 A    I've spoken to Mr. Gullett in the past on police contacts

19 where he's advised the same, that he is just, like, a middleman.

20 What, typically, that means to me is that he will hook someone

21 up with another individual that deals drugs so that they can get

22 drugs.

23 Q    Okay.  Did Mr. Gullett tell you anything about what would

24 be in the vehicle?

25 A    Rephrase, please.

1   Q    Did -- well, I'll get to that in a minute.  What else did

2   you ask him about, and what else did he tell you during your

3   post-Miranda conversation?

4   A    I had asked him about Mexi pills, fentanyl-based pills that

5   are a big thing that are happening in the Tri-Cities right now.

6   And he had addressed that he had tried it once, but it made him

7   real sick, and he hasn't done it since.

8   Q    Okay.  Did you ask him about anything else?

9   A    I believe that was the extent at that time.  Later on in

10  our contact, I spoke to him about employment, and things of that

11  nature.

12  Q    Okay.  At any point in the night did he tell you about a

13  meth pipe in the car?

14  A    Yes.

15  Q    When, during the night, did that conversation happen?

16  A    Sorry.  That was during that initial conversation.

17  Q    Okay.  What did he say about a meth pipe?

18  A    He advised that he had a pipe that was a new pipe, and

19  hadn't been used.  He clarified that it was a meth pipe, and

20  that it was in the center console in a bag --

21  Q    Okay.

22  A    -- that he had just purchased.

23  Q    Okay.  And that conversation happened shortly after you

24  took him into custody?

25  A    Correct.

1  Q    Do you happen to remember if that was before or after you
2  called the K-9?
3  A    That was before.
4  Q    And you requested the K-9, correct?
5  A    Correct.
6  Q    And you were advised that the K-9 had alerted?
7  A    Yes, sir.
8  Q    What did you do then?
9  A    At that point we decided to seize the vehicle for the
10 application of a search warrant, and it was sealed with evidence
11 tape, and then impounded at our local facility that holds the
12 vehicles while a search warrant is being applied for.
13 Q    Did you ultimately apply for a search warrant?
14 A    Yes, sir.
15 Q    Would you have done an inventory search of the car?
16 A    At times we will do inventory searches as far as
17 documenting what's in there.  Lot of times we don't go into the
18 trunk when we're applying for a search warrant, just to keep the
19 warrant itself fresh, so that we don't tamper with anything.
20 Q    Okay.  So let me ask the question a different way.
21       If there wasn't any K-9 available that night, would
22 you have processed the car and done an inventory search of the
23 car?  Would you have seized the car that night?
24 A    If there was no K-9, no.
25 Q    Okay.  You have specific policies in situations in place as

1   to when you do an inventory search and when you do not, correct?

2   A    Correct.

3   Q    In this case you got a search warrant, but if you hadn't

4   gotten the search warrant, or hadn't had the dog hit, then you

5   probably would not have seized the car, and you probably not

6   have done an inventory search, correct?

7   A    Correct.

8   Q    Okay.  Let's go back -- you had mentioned that you had

9   heard some information that Mr. Gullett was dealing; is that

10  correct?

11  A    Yes, sir.

12  Q    What had you heard, and from who?

13  A    I can't say exactly who.  When we arrest people, we -- with

14  the Criminal Apprehension Team, we're a -- intelligence-based

15  policing is what we call it, and we work a lot off of

16  information that we obtain from individuals that can be either

17  people that call in information, being citizens, or it can be

18  confidential informants, or it can also be individuals we talk

19  to on the way to jail that we've arrested on warrants or other

20  charges, and things of that nature.  So some of that information

21  is obtained during transportation, and things of that nature.

22  Q    Okay.  In those types of conversations, had you heard

23  information about the defendant dealing?

24  A    Yes.

25  Q    Do you remember any specific details, or was it just he's

1  selling drugs?

2  A    There was one bit of information that I can recall that was

3  from one of our other teams that they had received that

4  Mr. Gullett was staying in a -- the Super 8 Motel, and he was

5  dealing out of his room.

6  Q    Had you gone to the Super 8 Motel looking for Mr. Gullett?

7  A    I believe the previous night is when that came in, and we

8  had been through the motel, and we did not see or come across

9  Mr. Gullett.

10       MR. SHELTON:  I'm sorry, Your Honor.  I did not hear

11  the last part of the witness's answer.

12       THE COURT:  All right.  Let's just read the answer

13  back.  I believe the previous night is when that came in, and we

14  had been through the motel, and we did not see o-r-t question

15  Mr. Gullett.  Translation problems with the record.

16       MR. SHELTON:  That's all right.  Thank you,

17  Your Honor.

18       THE COURT:  Did I capture your answer accurately?

19       THE WITNESS:  Yes.

20  Q    (By Mr. Seal)  Are you aware that in -- that night when you

21  took Mr. Gullett into custody, were you aware that, in November

22  of 2017, that Mr. Gullett had -- that police had seized a half

23  ounce of methamphetamine from him?

24       MR. SHELTON:  Objection to relevance, Your Honor.

25  That was several months before.  I don't know why it would be

1    relevant to February 2019.

2            THE COURT:  Thank you.  Let me look at the question.

3        (PAUSE)

4            THE COURT:  Overruled.

5    Q    (By Mr. Seal)  You can go ahead and answer the question.

6    A    Yes, I am.

7    Q    And were you aware that in March of 2018 Mr. Gullett had

8    been observed by law enforcement engaging in a hand-to-hand

9    transaction, he was immediately arrested on a felony warrant,

10   and then a small amount of methamphetamine was found in his

11   pocket?

12           MR. SHELTON:  Same objection, Your Honor.

13           THE COURT:  Relevance?

14           MR. SHELTON:  Yes.

15           THE COURT:  Overruled.

16   A    I would have to refer to that one.  I don't recall that one

17   directly.

18   Q    (By Mr. Seal)  Okay.  And were you aware that, in November

19   of 2018, that Mr. Gullett was interviewed by police, and he

20   admitted that he had met with a female to discuss drug prices?

21   A    Yes.

22   Q    In fact, was that one that you were personally involved

23   with?

24   A    Yes.

25   Q    Okay.  Was it that date in November 2018 that Mr. Gullett

1   was referring to when he said, like I told you before, I just --

2   I put people together, I middle deals?

3   A    I believe it was, but I can't say a hundred percent sure

4   that that was the contact that came out.

5   Q    Okay.

6           MR. SEAL:  Pass the witness.

7           THE COURT:  All right.  Mr. Shelton.

8           MR. SHELTON:  Thank you, Your Honor.

9                      CROSS-EXAMINATION

10  BY MR. SHELTON:

11  Q    Good afternoon, Officer.

12  A    Good afternoon.

13  Q    Officer, you indicated you've got a copy of your report

14  with you, correct?

15  A    Yes, sir.

16  Q    And just for the record, that report was included verbatim

17  in a search warrant application that you submitted to get the

18  warrant for the car, correct?

19  A    Yes, sir.

20  Q    Okay.  Now, as I understand your testimony to Mr. Seal

21  earlier, you said you can't exactly say who gave you the tips

22  about Mr. Gullett?

23  A    Correct.  We receive information all the time from

24  individuals.

25  Q    And, for instance, some of the individuals you mentioned

1   are people that you have arrested?

2   A    Correct.

3   Q    And when these people are arrested, is it fair that

4   sometimes they'll give you information to try to help themselves

5   out, possibly avoid charges, minimize the time they're going to

6   get, that kind of thing?

7   A    Yes, sir.

8   Q    So, naturally, someone who is arrested kind of has an

9   incentive to cooperate in that situation and give you

10  information, right?

11  A    Yes, sir.

12  Q    Now, that information you get, you don't normally include

13  that in your arrest reports all the time, right?

14  A    No, sir.

15  Q    In fact, there's no record anywhere of the tips you got for

16  Mr. Gullett in this case, are there?

17  A    No, sir.

18  Q    So you can't recall who, specifically, gave you those tips?

19  A    Correct.

20  Q    You don't know whether they were arrestees?

21  A    If what?

22  Q    You don't know if they were people you had arrested?

23  A    (No response).

24  Q    You don't know whether the people who gave you the tips

25  were people who were under arrest?

1   A    I don't know for sure.

2   Q    You don't know if they were, I think you said, citizen

3   call-ins?  You don't know if they were citizens?

4   A    Correct.  If I recalled, I'd be able to tell.

5   Q    Sure.  I just want to make clear, you don't know if any of

6   these people were facing charges?

7   A    No.  And we can't make deals.  The prosecutor makes the

8   deals with a situation if someone is going to get a lesser

9   charge or something.  But we talk to the individual because

10  we're in contact with them, and then we will pass that on to the

11  prosecutor, who ultimately would decide whether or not that was

12  someone that we could work with, and it would be a potential

13  confidential informant.

14  Q    And the reason you would pass that along to prosecutors, as

15  well as some other officers, is potentially to affect their

16  criminal cases, right?

17  A    Correct.

18  Q    Because if someone is going to be used as a cooperator, you

19  don't want to hit them with the most serious charge, and give

20  them 20 years, right?

21  A    Well, it's double-edged sword.

22  Q    Could you explain what you mean by that?

23  A    I mean, obviously, we have a case that -- someone that's

24  under arrest for a certain situation, and you kind of try to

25  work up the ladder, per se, to --

1   Q    Let me phrase it a different way.  All else equal, if you
2   have someone else you've arrested who has cooperated and given
3   you information, in a perfect world, you want to help that
4   person out, all else equal, compared to someone who didn't
5   cooperate?
6              MR. SEAL:  Objection.  Relevance.
7              THE COURT:  Relevance, counsel?
8              MR. SHELTON:  Your Honor, given that we know nothing
9   about the people who provided these tips information, I think
10  it's certainly relevant to establish they could have been
11  persons who were under arrest, facing significant charges, and
12  therefore it might undermine their credibility, because they had
13  incentive to cooperate and tell the police officers what they
14  wanted to hear.
15             THE COURT:  How does your question and his answer help
16  address the issue that you were just mentioning?
17             MR. SHELTON:  I can try to rephrase to specifically
18  address that concern.
19             THE COURT:  Okay.  Objection -- I'll agree, and please
20  rephrase.  Sustained, I guess, is the word I was struggling
21  with.
22  Q    (By Mr. Shelton)  You have people you arrest that cooperate
23  with you?
24  A    Correct.
25  Q    And give you information?

1    A    Correct.

2    Q    And all else equal, they're giving you that information in

3    the hope that it might help their case?

4    A    Correct.

5    Q    It may not, because that decision is not up to you?

6    A    Exactly.

7    Q    But all else equal, that's generally why people will

8    cooperate, or one of the reasons?

9    A    Yes.

10   Q    Okay.  And it is certainly possible that these persons who

11   gave you this information on Mr. Gullett might have been in that

12   situation, right?

13   A    Yes.

14   Q    Now, if we could talk specifically about some of these tips

15   in your report, you say that the CAT detectives had received

16   these tips.  Did you personally receive them, or other members

17   of your team?

18   A    I have heard Mr. Gullett's name involved in drug dealing.

19   I've been personally involved in arresting him and know the

20   history of Mr. Gullett through my police work, and --

21   Q    Why -- I'm sorry.  I didn't mean to cut you off.

22   A    No, that's all right.

23   Q    Go ahead.

24   A    And I know that some of our other detectives have received

25   information.

1    Q    I understand that.  And you've been through some of that

2    history.  My question is:  These tips you received, and you

3    don't remember who they're from, did you receive them

4    personally, or did they go to another officer and get relayed to

5    you secondhand, or do you remember?

6    A    Both.

7    Q    Both?

8    A    (Witness nods head).

9    Q    So some of these tips, you would have received directly

10   from the arrestee person, whoever gave you that information?

11   A    Correct.

12   Q    Whereas, some you would have received after the fact from

13   some of your teammates?

14   A    Yes, sir.

15   Q    Okay.  You talked about a tip you got about the Super 8

16   Motel, and you said you went to Super 8 the previous night.  Are

17   you referencing February 21st?

18   A    I believe it was the 21st or 20th.  I can't recall exactly.

19   Q    But you believe it was one of those two dates?

20   A    It was in the recent couple days from the time we arrested

21   Mr. Gullett.

22   Q    And the tip was that Mr. Gullett was staying at the

23   Super 8?

24   A    Correct.

25   Q    And that he was dealing drugs out of that location?

1  A    Out of his room.

2  Q    Out of his room.  And you said you went to the Super 8 to

3  investigate that?

4  A    We went to the Super 8 to see if we could observe any

5  vehicles, things of that nature.  We didn't go in and check for

6  a room or anything at that point.

7  Q    And you said you didn't see Mr. Gullett at that Super 8?

8  A    No, sir.

9  Q    Did you check with the hotel staff to see if he'd been

10  staying there?

11  A    No, sir.

12  Q    And you said you were looking for vehicles.  So you went to

13  the Super 8 to see if a particular vehicle was there?

14  A    To see if there was any vehicles associated to Mr. Gullett.

15  Q    Were there any particular vehicles you believed were

16  associated with Mr. Gullett?

17  A    I believe Mr. Gullett had a -- I can't remember what kind

18  of vehicle it is, but it's white, with a gold trim below it that

19  he used to drive.

20  Q    Was the Saturn Ion a vehicle that you were looking for at

21  the Super 8?

22  A    I don't know.

23  Q    You don't know whether you were looking for the Saturn Ion

24  on February 20th or 21st?

25  A    Repeat that, please.

1   Q    You don't know whether you were looking for the Saturn Ion

2   on February 20th or 21st at the Super 8?

3   A    No, we weren't looking for that vehicle at that time.

4   Q    You were not looking for that.  And yet you testified

5   that's the vehicle you identified at the Motel 6 on the 22nd,

6   correct?

7   A    Yes, sir.

8   Q    Okay.  You hadn't had any personal contact with Jeremy

9   Gullett in 2019 before February 22nd, right?

10  A    No, sir.

11  Q    You hadn't surveilled him and seen him dealing drugs in

12  2019?

13  A    No, sir.

14  Q    You hadn't seen him at this particular Motel 6 before

15  February 22nd?

16  A    Not in 2019, no.

17  Q    And that was what I intended to ask.  Thank you for that

18  clarification.

19         You hadn't seen Mr. Gullett commit any crimes in 2019

20  before February 22nd?

21  A    I would have to look through my reports and things, but I

22  don't recall.

23  Q    You don't recall him committing any crime, to your

24  knowledge, in 2019?

25  A    Correct, being involved in any --

1   Q    Okay.  You did not have any specific information that

2   Mr. Gullett was going to be at that Motel 6 on February 22nd,

3   right?

4   A    No, sir.

5   Q    You just, essentially, happened upon him in the parking lot

6   that night?

7   A    Correct.

8   Q    And if I understood your testimony on direct, you

9   recognized the car first?

10  A    Yes.

11  Q    But you testified that just a day or two before you were

12  not looking for that car associated with Mr. Gullett?

13  A    Correct.  Do you want me to clarify on that?

14  Q    I don't.  The government might.

15       You recognized Mr. Gullett as the driver?

16  A    Yes.

17  Q    You arrested --

18  A    I recognized him as the male seated in the driver's seat.

19  He was not driving at that time.

20  Q    Correct.  So for that clarification, he was in the driver's

21  seat of the car, but the car wasn't running, he wasn't driving?

22  A    Correct.

23  Q    You knew he had a valid warrant?

24  A    Yes, sir.

25  Q    You arrested him pursuant to that warrant?

1    A    Yes, sir.

2    Q    And that warrant was for failure to appear?

3    A    I don't recall what the warrant was for.

4    Q    Do you recall if you'd seen a copy of the warrant, or if

5    you just knew he had a warrant?

6    A    I knew he had a warrant.

7    Q    Mr. Gullett was compliant when he got out of the car?

8    A    Yes, sir.

9    Q    You put him in handcuffs?

10   A    Yes.

11   Q    You put him in your vehicle?

12   A    Yes, sir.

13   Q    The female passenger who had been in the Ion, you said she

14   was outside the car when you saw her?

15   A    When I saw her, she was outside the vehicle.

16   Q    You didn't detain or handcuff her?

17   A    No, sir.

18   Q    You -- and she didn't tell you anything, before you called

19   the K-9, to indicate there would be any drugs in the vehicle?

20   A    No.  I didn't speak with her.

21   Q    At any point?

22   A    I don't recall.  I didn't -- no, I don't recall speaking

23   with her at all.

24   Q    Okay.  And as I understand your testimony, before you

25   activated your lights and initiated your contact with

1    Mr. Gullett, you didn't see him commit any criminal actions,

2    suspicious movements, anything of that nature?

3    A    Other than being a wanted subject, that's it.

4    Q    Other than?

5    A    Being a wanted subject.

6    Q    You didn't see him do a hand-to-hand transaction with

7    anyone?

8    A    No, sir.

9    Q    You didn't see him light something up in the car and start

10   smoking?

11   A    No, sir.

12   Q    You didn't see him waving a gun around?

13   A    No.

14   Q    You didn't see him look like he was trying to hide

15   something in the seats?

16   A    No.

17   Q    Okay.  And when you searched him incident to arrest, all

18   you found on him was a sum of money?

19   A    A large sum of money, yes.

20   Q    All right.  And you didn't find any drugs on him?

21   A    No, sir.

22   Q    Didn't find any paraphernalia, like a pipe, on his person?

23   A    No, sir.

24   Q    Now, he told you at some point before you called the K-9

25   that there was a pipe in the car, correct?

1    A    Correct.  I forgot to mention that when I initially
2    testified.  After Mirandizing him.
3    Q    Correct.  And he told you that that was a clean pipe, never
4    used?
5    A    Correct.
6    Q    He told you he bought that pipe at a store that day?
7    A    I can't recall if it was that day, but he told me he
8    recently had purchased the pipe.
9    Q    He denied there being any drugs in the vehicle?
10   A    Correct.
11   Q    And it's not a crime to buy a glass pipe in and of itself,
12   correct?
13            MR. SEAL:  Objection.  Calls for a legal conclusion.
14            THE COURT:  Sustained.
15   Q    (By Mr. Shelton)  If all you knew about him was that glass
16   pipe, without any of the other tips you received, would you have
17   called the K-9?
18   A    If I didn't know Mr. Gullett, and --
19   Q    If he was just a random citizen, and had a clean glass pipe
20   in his car, would you call a K-9 to search it for drugs?
21   A    I can't really answer it without being in that situation, I
22   guess.
23   Q    Can't put yourself in that situation hypothetically?
24   A    There's a lot of factors that come into play when you're in
25   those situations, what someone looks like, what their actions

1   are, who they're associated with.  There would be some different

2   factors that would play into it besides just the clean pipe.

3   Q    Since you can't say yes, you would -- it's fair to say you

4   might not call a K-9 in that scenario, right?

5          MR. SEAL:  Objection.  I think that misstates his

6   testimony.

7          THE COURT:  Agreed.  Sustained.

8          MR. SHELTON:  Your Honor, essentially, if I could,

9   that's why I was asking the question, to clarify his testimony.

10  I was not clear on his answer, whether we were getting a yes or

11  a no.

12         THE COURT:  I understood his answer to be that he

13  can't speculate as to what he would have done had he not known

14  all these things about the defendant that he, in fact, did at

15  the time he arrested the defendant on February 22nd, 2019.

16  That's how I understood the answer to the question.

17         MR. SHELTON:  Fair enough.

18  Q    (By Mr. Shelton)  You made the decision to call Officer

19  Merkl and get a K-9 search, correct?

20  A    Yes, sir.

21  Q    And your decision to call Officer Merkl was based -- at

22  least in part based on these tips you'd receive about

23  Mr. Gullett, correct?

24  A    Right.

25  Q    You hadn't seen anything on February 22nd that would lead

1   you to believe he had drugs in the car?

2   A    Part of the basis was knowing Mr. Gullett, and the history

3   I had with him with police contact in the past.  Part of it was

4   the fact he had admitted there was a meth pipe in the car.

5   Clean or not clean, I couldn't tell.  Other parts were the fact

6   that he had a large sum of money on him, what correlated with

7   the testimony -- or the tips that we had received that he was

8   dealing.

9   Q    So you're saying essentially there were three things that

10  prompted you to call for the K-9?  One is just your general

11  history with Mr. Gullett, knowing of his prior arrests, prior

12  involvement with drugs, correct?

13  A    That's one of them.

14  Q    One.  Two was the tips that you had received prior to

15  February 22nd about his alleged current involvement with dealing

16  drugs?

17  A    Correct.

18  Q    And third was the fact that he told you he had a pipe in

19  the car that he claimed was clean?

20  A    Amongst other things, too.

21  Q    Amongst what things?

22  A    The fact that he says he's a middleman, what means he has

23  connections with narcotics.  Things of that nature.  Just,

24  again, it's the scenario of the situation.  Motel 6 is known for

25  narcotics activity, so a lot of these factors come into play.

1      MR. SHELTON:  If I could have a moment, Your Honor, I

2 just want to pull up the report before I ask a follow-up.

3      THE COURT:  Yes.

4    (PAUSE)

5 Q   (By Mr. Shelton)  Do you have a copy of your report in

6 front of you in case I ask a question about it?

7 A    Yes, sir.

8 Q    Okay.  Just wanted to make sure.

9    (PAUSE)

10     MR. SHELTON:  Sorry, Your Honor.  I'm having apparent

11 technological difficulty with the wi-fi to open up this

12 document.

13 Q   (By Mr. Shelton)  While we wait, I can ask you a couple

14 questions, and we can come back to that.

15       When you called the K-9, Mr. Gullett was still in

16 custody?

17 A    Correct.

18 Q    He was handcuffed?

19 A    Yes, sir.

20 Q    He was in your vehicle?

21 A    Yes, sir.

22 Q    He was not within reach of the Saturn Ion?

23 A    No, sir.

24 Q    I'd like to ask you a couple of questions about calling out

25 a K-9 officer.  You don't call out K-9 officers for every single

1   arrest you make, right?

2   A    No, sir.

3   Q    You don't call out K-9 officers every time you arrest

4   someone in a vehicle, right?

5   A    Every time what?

6   Q    Every time you arrest someone who was in a vehicle.

7   A    No, sir.

8   Q    You don't call out K-9 officers -- yeah, I don't -- you

9   don't call out K-9 officers every time you arrest someone on a

10  warrant?

11  A    No, sir.

12  Q    You don't even call out K-9 officers every time you arrest

13  someone who happens to have a prior record involving drug

14  offenses?

15  A    No, sir.

16  Q    It's fair to say that generally when you call out a K-9,

17  it's because you suspect someone is in possession of drugs,

18  right?

19  A    The circumstances of the situation usually give us more

20  reasonable suspicion that there's a reason to call the K-9 out.

21  Q    And I understand you're saying circumstances may change

22  case to case --

23  A    Right.

24  Q    -- but generally you have some suspicion this person has

25  drugs on them, has drugs nearby, has drugs in their car, right?

1   A    Correct.

2   Q    When you were talking earlier about Mr. Gullett being a

3   middleman, and the statements he made to you about that, did you

4   understand him to be speaking in the present tense, saying he

5   was presently a middleman dealing drugs?

6   A    As in, like, that moment, or do you mean --

7   Q    As in was he distinguishing in the past, like I've told you

8   before, I've been a middleman, or was he saying I'm still being

9   a middleman?  What was your understanding?

10  A    I took it as he is a middleman.

11  Q    Okay.

12        MR. SHELTON:  I believe I've finally got the report to

13  come up, so if I could have one moment.

14  (PAUSE)

15  Q    (By Mr. Shelton)  All right.  You have a copy of your

16  report, right?

17  A    Yes, sir.

18        MR. SHELTON:  And for record purposes, what I'm

19  looking at, for the court, is ECF 26-2.  It was attached as

20  Exhibit 2 to our motion.

21  Q    (By Mr. Shelton)  It's a copy of your report.  First page

22  of that report, or at least the page I'm looking at, has some

23  highlighted portions, says supplemental information, Case

24  No. 19-06462?  Does that look right, just so we're looking at

25  the same thing?

1    A    You're going to have to give me a little bit more.  I'm

2    sorry, I don't have the highlights.  I have the supplemental

3    notes.  Is that what you're talking about?

4          MR. SHELTON:  Could I hand the witness a copy of the

5    copy I have to make sure it's the same document?

6          THE COURT:  Please, yes.

7          MR. SHELTON:  May I approach?

8          THE COURT:  Yes.

9    Q    (By Mr. Shelton)  All right.  I've handed you what's marked

10   as ECF 26-2, Exhibit 2.  Is that identical to the report you

11   have in front of you, or is that a different report?

12   A    Nope, that's the same, same report.

13   Q    Okay.  And you can look at Page 2 of that report, which I

14   believe at the bottom is noted as Page 8 of 24?

15   A    Yes, sir.

16   Q    And there's a paragraph in there that begins I asked

17   Gullett if he was dealing narcotics, correct?

18   A    Correct.

19   Q    And you quote Mr. Gullett as saying, just as I have told

20   you in the past, I have been like a middleman for someone that

21   needs some, right?

22   A    Yes, sir.

23   Q    And he denied being a dealer?

24   A    Yes, sir.

25          MR. SHELTON:  No further questions at this time,

1   Your Honor.

2            THE COURT:  Mr. Seal, anything further?

3            MR. SEAL:  Just very briefly.

4                    REDIRECT EXAMINATION

5   BY MR. SEAL:

6   Q    Could you clarify, why is it that you were looking for a

7   specific vehicle on the day you arrested the defendant?

8   A    After the initial tip came in, we looked for Mr. Gullett as

9   far as at the location.  We didn't investigate the room or

10  anything.  But Detective Grant, I believe, is the one that

11  obtained a license plate from the clerk at the motel the night

12  after the initial tip.

13  Q    Okay.  So you had gotten a tip that he was at the Super 8?

14  A    Correct.

15  Q    You looked for him there but didn't find him?

16  A    Correct.

17  Q    But Detective Grant had spoken to the hotel management at

18  the Super 8, and they had provided a make and model of the

19  vehicle, or license plate of a vehicle that was used by

20  Mr. Gullett; is that correct?

21  A    Correct.

22  Q    So that's why you were looking for that vehicle on the day

23  you arrested him?

24  A    Yes, sir.

25           MR. SEAL:  Pass the witness.

1          THE COURT:  Mr. Shelton, anything further?

2          MR. SHELTON:  No questions, Your Honor.

3          THE COURT:  All right.  Thank you, Detective.  I

4    appreciate your time here today.

5          THE WITNESS:  Do you need this back, sir?

6          THE COURT:  He might, but I don't.

7          Do you want your exhibit back?

8          MR. SHELTON:  Sure.  May I approach?

9          THE COURT:  Yes.

10          MR. SHELTON:  Thank you.

11          THE COURT:  Okay.  Anything further?

12          MR. SEAL:  I do have one more witness, Your Honor,

13    that I will try and keep focused.

14          THE COURT:  All right.

15          MR. SEAL:  Government calls Detective Elizabeth Grant.

16          THE COURT:  Detective Grant, if you can come up to the

17    chair, if you would.  But before you have a seat, turn and face

18    the courtroom deputy, Erin, and she will swear you in.  Raise

19    your right hand.

20       (ELIZABETH GRANT, appearing as a witness for the
          government, being duly sworn, testified as follows:)
21

22          THE COURT:  Go ahead and have a seat.  Thank you.

23                      DIRECT EXAMINATION

24    BY MR. SEAL:

25    Q    Good afternoon.

1   A    Hello.

2   Q    Could you tell us your name and where you work?

3   A    Elizabeth Grant.  I'm a detective for the Kennewick Police

4   Department.

5   Q    Could you pull the mike just a tiny bit.

6   A    Is that better?

7   Q    Yes.  Thank you.

8        How long have you been a -- how long have you been an

9   officer with KPD?

10  A    10 years.

11  Q    And are you part of the CAT, the criminal apprehension

12  team?

13  A    I am.

14  Q    When did you become part of CAT?

15  A    I joined in July of 2017.

16  Q    And were you working with Detective Schwartz on

17  February 22nd of 2019?

18  A    I was.

19  Q    And the two of you arrested the defendant that day at a

20  motel parking lot, correct?

21  A    Correct.

22  Q    Had you received any tips or information about Mr. Gullett

23  prior to that day?

24  A    Yes.

25  Q    What had you heard, and from who?

1    A     So just shortly prior to that -- our job is to arrest

2    people.  And then on the way to jail we typically talk to them,

3    see if they'll provide us any information.  And we got several

4    people we had taken to jail that told us he was their source, or

5    was dealing narcotics.

6    Q     And it's pretty common for you to have those types of

7    informal conversations with people on the way to the jail,

8    correct?

9    A     Correct.

10   Q     And do those types of conversations -- they don't formally

11   become your confidential informant and work in a contractual

12   relationship with you or Detective Schwartz, correct?

13   A     Correct.

14   Q     That's just an informal chat about who their dealer is on

15   the way to the jail?

16   A     Yes.  We typically try to engage anybody we arrest, just

17   learn information about what's going on.

18   Q     And do you recall when any of those types -- when you

19   received any of that type of information about Mr. Gullett

20   dealing narcotics?

21   A     Within the last couple of months prior to arresting him.

22   Q     Okay.  And when you saw him on February 22nd, did you

23   recognize him?

24   A     I did.

25   Q     How did you know who he was?

1    A    I have dealt with Mr. Gullett numerous times, and, so, I
2    recognize him on sight.
3    Q    Did you witness Detective Schwartz Mirandize Mr. Gullett?
4    A    I did.
5    Q    In between -- let me back up a little bit.  Were you
6    present when Detective Schwartz had a post-Miranda conversation
7    with Mr. Gullett?
8    A    Yes.
9    Q    Okay.  After Detective Schwartz's questioning finished,
10   what did you do?
11   A    I was sitting in our patrol car and just had a
12   conversation.  Gullett and I were just talking, just kind of
13   general stuff, not about drugs or anything about that, just kind
14   of about life, and how he'd been.
15   Q    Okay.  After the K-9 had alerted, did you have any other
16   conversations with Mr. Gullett that were related to drug
17   dealing?
18   A    Yes.
19   Q    What did --
20   A    He asked what would happen now that the dog had alerted on
21   the vehicle.  And I explained to him that we would be seizing
22   the vehicle and applying for a search warrant, and if the search
23   warrant was granted, and we found narcotics in the vehicle, that
24   he would most likely be charged, and if we didn't find anything,
25   then the vehicle would be released.

1    Q    What did he say?

2    A    He then advised that we were going to find a lot of drugs

3    in the car and explained what, what kind of drugs, and that they

4    would be in the trunk.

5    Q    What did he say about what kind of drugs there would be?

6    A    He advised there would be close to half a pound of

7    methamphetamine, about a ounce of heroin, and about a quarter

8    pound of China white.

9    Q    What's China white?

10   A    Like a fentanyl derivative powder.

11   Q    And that amount of drugs that he referenced, is that an

12   amount for personal use or distribution?

13   A    No, for distribution.

14        MR. SHELTON:  Objection, Your Honor.  I understand

15   it's going to be easy to do, but I think we need to lay more

16   foundation before she can testify to that.

17   Q    (By Mr. Seal)  Are you aware what would be an amount for

18   personal use versus what would be an amount for distribution?

19   A    Most of the people that we arrest that have a personal

20   amount on them, you're talking about a couple of grams of meth,

21   couple of points of heroin.  I hadn't had any specific dealings

22   with the China white before.  With pills, one or two.  We

23   typically don't see much more than that.

24   Q    Okay.  Just a moment.

25        I want to ask about a couple of prior instances of law

1   enforcement contacts between Mr. Gullett -- with Mr. Gullett.

2   Were you aware that, in November of 2017, that police had seized

3   a half ounce of methamphetamine from Mr. Gullett?

4   A    Yes.

5         MR. SHELTON:  Same objection as to relevance.  I don't

6   think these prior contacts are relevant to the instant offense.

7         THE COURT:  The issue is -- well, what's your argument

8   as to relevance?

9         MR. SEAL:  Defense is arguing -- assuming that their

10  argument is correct, that the police did have to find some kind

11  of independent reasonable suspicion to bring the K-9, the fact

12  that these officers were aware that, in November of 2017,

13  Mr. Gullett had had a distribution amount of methamphetamine on

14  his person is relevant to reasonable suspicion on the day of his

15  arrest.

16        THE COURT:  Overruled.

17  Q    (By Mr. Seal)  Were you aware that he had been found with a

18  half ounce of methamphetamine in November of 2017?

19  A    Yes.

20  Q    And in March 2018, were you aware that he had been arrested

21  after doing what police observed as a hand-to-hand transaction?

22  A    Yes.

23  Q    And that he had meth on his person on that date?

24  A    Yes.

25  Q    And were you aware that, in November of 2018, that

1    Mr. Gullett had admitted to law enforcement that he had met with

2    a female to discuss drug prices?

3    A    Yes.

4    Q    Were you personally involved in that interview?

5    A    I was, yes.

6    Q    Tell us about that just really briefly.  I don't need the

7    whole blow by blow.  Did you talk to with Gullett that day?

8    A    Detective Schwartz did.  I was just present.

9             MR. SEAL:  I think that's all, then.  Pass the

10   witness.

11            THE COURT:  Mr. Shelton.

12            MR. SHELTON:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. SHELTON:

15   Q    Good afternoon.

16   A    Hello.

17   Q    I just want to review a couple of things on the record

18   before I get to my questions.  You said the tips you got, you

19   received sometime within the last couple of months?

20   A    Correct.

21   Q    And you had several people tell you that Mr. Gullett was

22   their source of narcotics, or somehow had gotten them narcotics?

23   A    Yes, that they had -- yes.

24   Q    You don't remember specifically who any of those people who

25   gave you tips were?

1   A     No.  People we arrested on warrants and transported to

2   jail.

3   Q     Do you know that everyone who gave you tips on Gullett was

4   somebody who was under arrest?

5   A     If everyone that gave us tips were?

6   Q     Yes.

7   A     Yes.

8   Q     That helps.  Thank you.

9         So who gave you tips in that couple of months was

10  under arrest and gave you that information, in a manner of

11  speaking, with the hope that it would help them in their case,

12  right?

13  A     Not necessarily helping with a case, no.

14  Q     I guess, let me rephrase.  With the intent of helping them

15  with whatever they were facing?

16  A     We didn't ever offer anyone anything, no.

17  Q     Is it common that people you arrest will tell you something

18  hoping it might help them, even if it may not?

19  A     Yes.

20  Q     Because that decision is not up to you?

21  A     Correct.

22  Q     And they may not even have a case filed?

23  A     Correct.

24  Q     So that's why you're saying maybe, maybe not?

25  A     Yeah.  Just conversations, yup.

1   Q    But their motivation, at least in part, is likely to try

2   and help themselves?

3   A    You'd have to ask each one of them, but, yes.

4   Q    In your experience, is that a common motivation?

5   A    Yes.

6   Q    Thank you.

7              Now, when you went to the Super 8, because that was

8   one thing -- or, actually, I don't recall if you specifically

9   testified about that.  Before you encountered Mr. Gullett on

10  February 22nd, did you go to a Super 8 motel to try to find him?

11  A    Yes.

12  Q    Do you recall when that was?

13  A    It would have been either the day or two days prior to us

14  arresting him.

15  Q    So either the 20th or 21st?

16  A    Right.

17  Q    And what led you to the Super 8 was a tip from someone that

18  Mr. Gullett was at that motel?

19  A    Correct.

20  Q    You personally went to the Super 8?

21  A    I did.

22  Q    You did not find Mr. Gullett there?

23  A    I did not.

24  Q    You didn't see any vehicle associated with him there?

25  A    No.

1  Q    Just to make this easier, you spoke with the motel staff

2  while you were there on the 20th or 21st, right?

3  A    Correct.

4  Q    And you asked them if Mr. Gullett had been staying there?

5  A    Correct.

6  Q    And they told you he had been there at some point?

7  A    Yes, but that he had checked out.

8  Q    Did they tell you when he checked out?

9  A    I want to say when we went and contacted them, it would

10  have been the night prior to.

11  Q    So if you went the 20th or 21st, he would have checked out

12  either the 19th or the 20th?

13  A    Right.

14  Q    Now, did they give you -- and they gave you some

15  information on a vehicle that Mr. Gullett was associated with

16  while he was there?

17  A    Correct.

18  Q    And that was the Saturn Ion?

19  A    Yes.

20  Q    And that's why you were looking for the Saturn Ion on

21  February 22nd?

22  A    Yes.

23  Q    So you didn't get that particular source from any of those,

24  what I'll call arrestee tipsters?

25  A    No.

1   Q    Now, you mention in your police report on this offense that

2   the CAT team had previously arrested Mr. Gullett with drugs on

3   his person before?

4   A    Correct.

5   Q    And, in fact, you reviewed some of those prior instances

6   that you were either aware of or personally involved with

7   Mr. Seal, right?

8   A    Correct.

9   Q    All of these incidents were from 2018 or earlier, right?

10  A    Correct.

11  Q    You hadn't had any contact with Mr. Gullett in 2019 prior

12  to February 22nd?

13  A    No.

14  Q    You hadn't surveilled him or seen him committing any

15  crimes?

16  A    We had seen him, but, no, we hadn't been surveilling him.

17  Q    You didn't personally arrest him for any offenses prior to

18  February 22nd in 2019?

19  A    Correct.

20  Q    And when you're referencing these prior interactions with

21  him, normally, in your line of work, would you suspect someone

22  has drugs on them simply because they have prior arrests and

23  convictions for drug offenses?

24  A    No.

25  Q    Because you have to get some kind of information that they

1  currently are dealing or using, right?

2  A    Right.

3  Q    You did not have any specific information from any of these

4  tipsters or from the Super 8 staff that Mr. Gullett would be at

5  the Motel 6 on February 22nd, right?

6  A    No.

7  Q    You just, essentially, happened upon him --

8  A    Correct.

9  Q    -- in the parking lot?

10  A    Yes.

11  Q    And you saw the Saturn Ion first?

12  A    Yes.

13  Q    And then you verified that Mr. Gullett was seated in the

14  driver's seat?

15  A    Yes.

16  Q    And you never saw that vehicle move at any point during

17  your interaction with him?

18  A    No.

19  Q    Never saw it turned on?

20  A    No.

21  Q    You verified that vehicle was the same vehicle Super 8

22  staff had told you about?

23  A    Yes.

24  Q    And as soon as you recognized Mr. Gullett, either you or

25  Officer Schwartz activated your emergency lights?

1   A     Correct.

2   Q     Initiated your encounter with him?

3   A     Yes.

4   Q     Took him into custody without incident?

5   A     I'm sorry, what?

6   Q     You took him into custody without incident?

7   A     Yes.

8   Q     He was handcuffed?

9   A     Yes.

10  Q     He was placed in the back of your unmarked vehicle?

11  A     Correct.

12  Q     And sounds like, for a portion of that time, you were in

13  the vehicle with him?

14  A     Yes.

15  Q     The female passenger who was in the Saturn Ion, did you see

16  her inside the car or outside the car?

17  A     She was in the doorway of the passenger seat and was

18  walking around to the front when we pulled up.

19  Q     And you recognized her from a prior contact as well?

20  A     Correct.

21  Q     And you did not detain her?

22  A     No.

23  Q     You did not handcuff her?

24  A     No.

25  Q     And she didn't tell you or officer Schwartz anything about

1   Mr. Gullett having drugs in the vehicle that night?

2   A    No.

3   Q    Before the emergency lights were activated, you didn't

4   personally see Mr. Gullett commit any criminal actions?

5   A    No.

6   Q    You didn't see him do a hand-to-hand transaction?

7   A    No.

8   Q    You didn't see him appear as though he lit up a pipe and

9   was smoking something?

10  A    No.

11  Q    You didn't see him trying to hide something in the seats?

12  A    No.

13  Q    You never saw him get out of the car?

14  A    No.

15  Q    After you took him into custody, and he was searched, there

16  was some cash found on his person?

17  A    Correct.

18  Q    No drugs?

19  A    No.

20  Q    No paraphernalia, pipe, anything like that?

21  A    No.

22  Q    No gun, or no bullets?

23  A    No.

24  Q    After he was taken into custody and searched, Officer

25  Schwartz was the one who primarily questioned him?

1   A    Correct.

2   Q    But you were present for that questioning?

3   A    I was sitting in the front of the car, yes.

4   Q    You could hear that conversation?

5   A    Most of it.

6   Q    You heard Mr. Gullett deny dealing drugs?

7   A    Correct.

8   Q    You heard Mr. Gullett say that there were no drugs in the

9   vehicle --

10  A    Correct.

11  Q    -- at that time?

12  A    Correct.

13  Q    You heard Mr. Gullett tell Officer Schwartz that there was

14  a clean meth pipe in the vehicle?

15  A    Yes.

16  Q    And did Mr. Gullett tell Officer Schwartz where that pipe

17  was located?

18  A    I can't remember if he did or not, but he did mention that

19  it was in a bag in the vehicle.

20  Q    Okay.  Officer Schwartz is the one who decided to call for

21  the K-9, right?

22  A    Correct.

23  Q    Did Officer Schwartz have a discussion with you prior to

24  calling the K-9 --

25  A    No.

1  Q    -- about whether it should be done?

2         And after Mr. Gullett spoke with Officer Schwartz, you

3  also spoke with Mr. Gullett while you were waiting for the K-9

4  to arrive?

5  A    Correct.

6  Q    And you said you essentially engaged in general small talk?

7  A    Yes.

8  Q    He didn't confess to using drugs, or dealing drugs, or

9  anything at that point?

10 A    No.

11 Q    And when the K-9 was called for, and while the K-9 was

12 there, Mr. Gullett remained in custody the whole time?

13 A    Yes.

14 Q    Handcuffed?

15 A    Yes.

16 Q    In the vehicle?

17 A    Yes.

18 Q    Most commonly with you essentially guarding him, so to

19 speak, or sitting with him?

20 A    Yes.

21 Q    I'd kind of like to ask you now about your general

22 experience calling K-9s on arrests.  You don't call out K-9

23 officers every single time you arrest someone, right?

24 A    Correct.

25 Q    You don't call out K-9 officers every time you arrest

1  someone who's in a vehicle?

2  A    Correct.

3  Q    You don't call out a K-9 every time you arrest someone who

4  has a warrant?

5  A    Right.

6  Q    You don't call out a K-9 every time someone you arrest has

7  a prior record for drug offenses?

8  A    Correct.

9  Q    It's fair to say that you only call out K-9 officers when

10 there is some reason to suspect a person of possessing drugs?

11 A    Correct.

12 Q    And that could be prompted by a variety of things, but

13 there is some reason to suspect that?

14 A    Yes.

15          MR. SHELTON:  I believe that's all I have, Your Honor.

16          THE COURT:  Thank you.

17          Mr. Seal.

18          MR. SEAL:  No further questions.

19          THE COURT:  Thank you, Detective.

20          Anything else?

21          MR. SEAL:  No, Your Honor.  The government has no

22 further witnesses.

23          MR. SHELTON:  Your Honor, at this time we'd call

24 Officer Isaac Merkl.

25          THE COURT:  All right.

1          Officer, if you can have a seat there.  But before you

2   have a seat, the courtroom deputy will administer the oath.

3          (ISAAC MERKL, appearing as a witness for the defendant,
             being duly sworn, testified as follows:)

4

5          THE COURT:  Go ahead and have a seat.

6          MR. SEAL:  Your Honor, there's no objection -- I just

7   conferred with Mr. Shelton -- can we allow the two prior

8   witnesses to go?

9          THE COURT:  To go?

10          MR. SEAL:  Yes.

11          THE COURT:  Certainly.

12          MR. SEAL:  Thank you.

13          MR. SHELTON:  Just for the record, I did speak to

14   Mr. Seal.  We don't have any objection to Detectives Schwartz

15   and Grant being released.

16                        DIRECT EXAMINATION

17   BY MR. SHELTON:

18   Q    Good afternoon, Officer Merkl.

19   A    Good afternoon.

20   Q    How are you?

21   A    Apparently a little too close to the mike here.

22   Q    Could you state your name, spelling both your first and

23   last for the court reporter.

24   A    Isaac, I S A A C.  Merkl, M E R K L.

25   Q    Mr. Merkl, who are you employed with?

1   A    The City of Kennewick.

2   Q    Any specific branch of the city government?

3   A    The police department.

4   Q    How long have you been employed by the Kennewick Police

5   Department?

6   A    Since June of 2005.

7   Q    What are your current responsibilities with Kennewick

8   Police Department?

9   A    I'm a narcotics detection K-9 handler.

10  Q    How long have you been doing that?

11  A    Since June 22nd of 2013.

12  Q    What were your duties prior to that?  What was your

13  experience with the police department?

14  A    Prior to that I was with the Criminal Apprehension Team for

15  two plus years, and before that, on patrol for five plus years.

16  Q    Okay.  Have you ever worked for any other police

17  departments prior to Kennewick?

18  A    No.

19  Q    Could you talk, I guess, briefly, for the court's benefit,

20  about what your responsibilities as a K-9 officer entail?  What

21  is it you do on a kind of day-to-day basis?

22  A    Day-to-day depends on what other units are doing, what K-9

23  assistance they need.  But my primary objective is to ensure

24  that I handle our narcotics detection K-9 and train with him,

25  make sure he's ready to deploy.

1   Q    So you may do some training with the K-9 himself?

2   A    Yeah, we do training all the time.

3   Q    Do you do it daily?

4   A    Depending on the day, yeah.

5   Q    And in terms of having a K-9 out in the field, what prompts

6   you and the K-9 to go to a scene, go to a call, most commonly?

7   A    You're saying why an officer called for me?

8   Q    Correct.  Could you walk through that process.

9   A    They would call me and request my assistance at a location.

10  Q    You don't ever personally initiate a K-9 call, the call

11  comes in to you?

12  A    I could if there was some instance where that occurred, but

13  the majority of the time I'm responding to requests for K-9

14  assistance.

15  Q    Okay.  Do you get called out for a K-9 sniff at every

16  arrest in the community?

17  A    No.

18  Q    Do you get called out for a K-9 sniff at every arrest in

19  the community that involves a vehicle?

20  A    No.

21  Q    Do you get called out to do a K-9 sniff for every arrest

22  where the person in custody has a prior drug offense?

23  A    No.

24  Q    You generally get called out when the officers, or

25  yourself, if it's a call you initiate, have some suspicion that

1  the person is possessing drugs, right?

2  A    Sometimes.

3  Q    Could you clarify that?

4  A    Sometimes, you know, an officer -- an individual may be in

5  custody, and the vehicle is in a lawful place, and the officers

6  are in a lawful place, and may not have a reasonable suspicion,

7  but they think, based off of whatever, that there could be

8  narcotics in the car, we will do sniffs in that circumstance as

9  well.

10  Q    And just for the record, too, because this may end up being

11  important, you were in the courtroom earlier today during some

12  argument between the United States and Mr. Gullett about whether

13  the K-9 search should have occurred, right?

14  A    Correct.

15  Q    You heard that back and forth from counsel?

16  A    Yes.

17  Q    You heard what the court had to say about that issue?

18  A    Yes.

19  Q    When officers call you out to do a K-9 sniff -- to do a

20  sniff, do they generally tell you why they have reason to think

21  a suspect may have drugs?

22  A    Sometimes they do.

23  Q    Okay.  But sometimes they don't?

24  A    Correct.

25  Q    And specifically in this case, did Officer Schwartz tell

1   you, when he called you out, what his suspicions were?

2   A    He just said he believed there was narcotics in the

3   vehicle.

4   Q    Okay.  I'd like to talk with you about that incident.  So

5   this -- when did this sniff occur, to your recollection, with

6   Mr. Gullett?

7   A    I think it was February 22nd, 2019.

8   Q    Okay.  Before you applied -- I guess I should clarify

9   first.  The K-9's name in this case is what?

10  A    Bear.

11  Q    Before you applied Bear, did you talk to Mr. Gullett at

12  all?

13  A    No.

14  Q    Did he talk to you at all?

15  A    No.

16  Q    Before you applied Bear, did you talk to Officer Schwartz?

17  A    Yes.

18  Q    What did he tell you?

19  A    He told me that they arrested Gullett on a warrant, and

20  that there had been a female with him that had left.

21  Q    That had left?

22  A    Correct.

23  Q    Okay.

24  A    And he requested an exterior sniff of the vehicle.  I'm

25  sorry.  He also told me that Gullett had mentioned a

1   narcotics -- a meth pipe was in the vehicle, but that it hadn't
2   been used yet.
3   Q   Okay.  Did he tell you anything else?
4   A   Not that I recall.
5   Q   Before you applied Bear, did you talk with Officer Grant?
6   A   I might have said hi or something like that, but I don't
7   recall any sort of conversation between her and me.
8   Q   Okay.  Do you recall if she said anything to you about her
9   interactions with Gullett that evening?
10  A   No.
11  Q   Okay.  Morning.  After midnight.
12  A   Yeah.  I don't recall her and I having any substantial
13  conversation about anything that was occurring there.
14  Q   Where was Mr. Gullett when you arrived?
15  A   He was in the back of a police vehicle.
16  Q   Was he handcuffed?
17  A   I would hope so.  I think he was.  I couldn't tell you at
18  that time if he was or wasn't.
19  Q   And when you say "the vehicle," the police vehicle, not
20  his?
21  A   Yeah.  He was in the back of a -- I think it was Detective
22  Schwartz and Grant's vehicle.
23  Q   And you're not sure if he was handcuffed.  Did he ever
24  leave the vehicle?
25  A   No.

1  Q    Was there an officer in the car with him?

2  A    I don't know.

3  Q    Okay.  Do you know whether Mr. Gullett could see you

4  applying Bear to the vehicle?

5  A    Yes.

6  Q    Yes, he could?

7  A    Yes.

8  Q    Did he watch?

9  A    I don't know, but he made mention to it after I went and

10 talked to him.

11 Q    Okay.  And when you applied Bear to the vehicle, you walked

12 him -- how many times did he walk around it?

13 A    We start at the front driver's side wheel well.  And as we

14 finished the first pass, he alerted the driver's door.  I had

15 moved down the vehicle to make presentations.  He followed me to

16 that second presentation, and then as we finished the second

17 pass, he alerted and indicated on the driver's door.

18 Q    So all the alerts were to the driver's door of the vehicle?

19 A    That's the location that he indicated on, yes.

20 Q    Did he ever alert to the trunk?

21 A    No.

22 Q    And you said you spoke with Mr. Gullett after the search

23 and after the alert?

24 A    Correct.

25 Q    And when I say search, I mean sniff.

1    A    The sniff, yes.

2    Q    Mr. Gullett, you said, told you he saw Bear alert?

3    A    Yes.

4    Q    What else did Mr. Gullett tell you about why that alert may

5    have happened?

6    A    He told me that he had recently had methamphetamine on his

7    hands, which is why he thought the dog alerted on the vehicle.

8    Q    Did he tell you why he had meth on his hands?

9    A    He said that he had used it earlier in the day, in the

10   afternoon, and that he had had about an eightball of

11   methamphetamine in the vehicle sometime around the afternoon.

12   Q    Did Mr. Gullett tell you that he had any drugs in the

13   vehicle?

14   A    No.  He told me there were no drugs in the vehicle.

15   Q    Did Mr. Gullett admit to you that he was dealing drugs?

16   A    He said in the past he had dealt drugs, yes, on and -- or

17   here and there to get by, and that he was also fronted drugs at

18   times.

19   Q    You said in the past?

20   A    Correct.

21   Q    Did Mr. Gullett admit to you that he was currently dealing

22   drugs?

23   A    He didn't use the words "currently," no.

24   Q    And Mr. Gullett -- I want to make sure I heard you right.

25   You said Mr. Gullett denied drugs being in the vehicle that

1    night?

2    A     Correct.

3           MR. SHELTON:  If I could have one moment, Your Honor.

4           THE COURT:  Yes.

5        (PAUSE)

6           MR. SHELTON:  No further questions, Your Honor.  Pass

7    the witness.

8           MR. SEAL:  No questions, Your Honor.

9           THE COURT:  All right.  Thank you, Officer.

10   Appreciate your time today.

11          MR. SHELTON:  Since he's our witness, may the witness

12   be excused, Your Honor?

13          THE COURT:  He may.

14          THE WITNESS:  Thank you.

15          THE COURT:  Any other testimony or witnesses?

16          MR. SHELTON:  No further testimony or witnesses.

17          MR. SEAL:  Nothing further, Your Honor.

18          THE COURT:  Any other argument?  I think I have the

19   positions of the parties well in hand.

20          MR. SHELTON:  Your Honor, if we could briefly argue,

21   since we now have the testimony about the tips themselves,

22   because I think if the court does get to that issue, we have not

23   addressed whether the tips were sufficient.

24          THE COURT:  Five minutes a side.

25          MR. SHELTON:  Sure.  Would the court like to hear from

1    us first?

2              THE COURT:  Yes.  It's your motion.

3              MR. SHELTON:  So, Your Honor, obviously this court has

4    to consider as a threshold issue whether -- *Gant* and *Illinois*

5    and the K-9 search.  But if we get to the point of whether the

6    officers needed reasonable suspicion to search the car for

7    drugs, I think the answer is clear that they did not have it.

8              The officers testified they had these vague and

9    unsubstantiated tips from people they were arresting whose names

10   we don't know, background we don't know, credibility we cannot

11   assess, that Mr. Gullett was dealing drugs in the community.

12   Nobody said specifically when and where he would be in

13   possession of drugs or when and where he would be physically

14   present.

15             We've briefed in our motion and our reply some very

16   clear case law from the Supreme Court.  You have to treat these

17   as anonymous tips.  And these anonymous tips are not sufficient

18   to give the officers reasonable suspicion.

19             Since the tips are not enough, did the officers

20   observe anything on the night of February 22nd that would

21   independently give them reasonable suspicion?  No.  Both of the

22   officers involved in the immediate encounter, as well as Officer

23   Merkl, have all testified they did not see Mr. Gullett commit

24   any suspicious action, any furtive movement, anything that would

25   give them any suspicion at all.  So because the police did not

1   observe any of that, and because the tips were not sufficient,

2   they did not have reasonable suspicion to search the car.

3        Now, yes, in reality, they later go and get a warrant,

4   and that is when they actually physically search the car and

5   find the drugs.  But they would never have been able to get that

6   warrant without all of the resulting illegal activity;

7   specifically, the K-9 sniff and the purported confession that

8   happened after.

9        Their encounter with Mr. Gullett should have ceased as

10  soon as they arrested him and verified his warrant, because,

11  pursuant to *Gant*, they did not have any grounds to search the

12  car, and they never had any independent reasonable suspicion to

13  do so.  That's our argument.

14       Alternatively, we have argued in our motion that this

15  stop was extended an unconstitutional amount of time.  I think

16  the government points out a fair discrepancy that Mr. Gullett

17  was not free to go compared to the person at issue in *Rodriguez*.

18  But because the search of the car was an independent

19  investigation, I do think the court can consider the length of

20  this encounter.  I think it's sufficiently briefed as to why

21  that encounter was overly long.

22       So I think the court can suppress the evidence on

23  either of those grounds.

24            THE COURT:  Thank you.

25            Mr. Seal.

1    MR. SEAL:  Your Honor, good police work involves

2   arresting the most serious offenders.  And in this case

3   Detective Schwartz and Detective Grant had an arrest warrant for

4   the defendant, and they arrested him when he was in the middle

5   of committing a very serious crime of possessing a large amount

6   of methamphetamine and a gun in the trunk of his car.  So they

7   did exactly what we would want the CAT group to do, arrest

8   somebody for whom you already have a warrant, and especially

9   anyone who's got a warrant and is also in the middle of

10   committing another very serious crime.  That's what they did.  I

11   think it's really good police work.  I don't think there's any

12   bad police conduct here to deter, so I think the motion should

13   be denied.

14    THE COURT:  Okay.  I'm going to take this under

15   advisement.

16    I'm going to leave this case on for trial on the late

17   October date, but it's not going to trial.  I'm just leaving it

18   on the calendar because otherwise it can fall through the

19   cracks.  After I decide the motion, we'll make some decisions

20   regarding where the case goes after that.  So you don't need to

21   get witnesses lined up, you don't need to get jury instructions

22   filed, and of all that.  We're leaving it on the calendar for

23   purposes of not forgetting the case.

24    MR. SHELTON:  Your Honor, if the parties wish to file

25   any supplemental briefing, which we kind of discussed at the

1 outset, would you like that by a specific date, I imagine sooner

2 rather than later?

3       THE COURT:  Yeah.  How much time do you think you

4 need?

5       MR. SHELTON:  I think I could get it done in a week.

6 If the court wants it sooner than that, we could get it done,

7 but I'd like a week.

8       THE COURT:  Do you want to wait to see what is filed

9 before you respond?

10       MR. SEAL:  Yes, I would like to, Your Honor.

11       THE COURT:  So, assuming you get a brief from

12 Mr. Shelton next Friday, how much time would you need to write

13 something up in response?

14       MR. SEAL:  A week, Your Honor.

15       THE COURT:  Okay.  So let's do that.  I just closed my

16 calendar.  But the deadline will be --

17       MR. SHELTON:  The 11th and the 18th.

18       THE CLERK:  Next Friday would be the 11th.

19       THE COURT:  And then following week would be

20 Mr. Seal's response.  Okay.

21       MR. SHELTON:  Thank you, Judge.

22       MR. SEAL:  Thank you, Your Honor.

23       THE COURT:  Thank you.  Court's in recess.

24    (ADJOURNMENT AT 3:24 P.M.)

25

1                    REPORTER'S CERTIFICATE

2

3

4

5          I, LYNETTE WALTERS, Registered Professional Reporter,

6    Certified Realtime Reporter and Certified Court Reporter;

7          DO HEREBY CERTIFY:

8          That the foregoing transcript, Pages 1 through 93,

9    contains a full, true, complete and accurate transcription of my

10   shorthand notes of all requested matters held in the foregoing

11   captioned case, including all objections and exceptions made by

12   counsel, rulings by the court, and any and all other matters

13   relevant to this case.

14         DATED this 2nd day of March, 2019.

15

16

17                          s/ Lynette Walters
                            _____
                            LYNETTE WALTERS, RPR, CRR, CCR
18                          CCR NO. 2230

19

20

21

22

23

24

25